**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 99-11250**
_____


**UNITED STATES OF AMERICA,**

                                        **Plaintiff-Appellee,**


                        **VERSUS**


                **NAPOLEON JONES,**

                                **Defendant-Appellant.**


-------------------------------------------------------------


_____

**No. 99-11259**
_____


**UNITED STATES OF AMERICA,**

                                        **Plaintiff-Appellee,**


                        **VERSUS**


        **EDUARDO GABRIEL DANIEL,**

                                **Defendant-Appellant.**


Appeals from the United States District Court
For the Northern District of Texas

November 20, 2000

Before DUHÉ, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

In these appeals, which were consolidated for oral argument, both defendants Napoleon Jones and Eduardo Gabriel Daniel appeal their convictions arising out of a traffic stop where narcotics were found in their rental car. Because the narcotics were the fruit of an illegal seizure, we vacate the convictions and sentences and remand.

## I. BACKGROUND

On April 2, 1999, at approximately 11:57 a.m., Officers Tommy Russell and Barry Ralston initiated a traffic stop of a car just inside the city limits of Amarillo, Texas, for a speeding violation. Inside the vehicle were the two defendants, who were traveling from Los Angeles to Memphis. Upon being pulled over, Russell approached the vehicle on the driver's side while Ralston moved towards the passenger's side. Russell asked Daniel, the driver of the car, for his driver's license and proof of insurance. After Daniel produced his California driver's license and a rental car agreement for the vehicle, Russell asked Daniel to step outside the car.

With Ralston by his side, Russell notified Daniel that he had been stopped for speeding and would be issued a warning citation. Russell then asked a series of questions including: 1) whether the

vehicle was a rental car; 2) who had rented it; 3) what was the identity of the passenger; 4) where the defendants were going; and 5) why they were going to their destination. Daniel answered that the car was a rental, that his mother had rented the vehicle, that the passenger was his uncle, that the defendants were going to Memphis, and that they were going to Memphis for a couple of weeks to do some promotional work for Street Institute Records ("Street Institute"). Subsequent to further questioning, Daniel replied that he and Jones were from California, specifically Los Angeles County, and that they had worked together on other promotional deals in various other states.

At about 12:00 p.m., after instructing Daniel to stay by the road median, Russell began to question Jones. First, Russell advised Jones that the car had been stopped for speeding and that the defendants would be issued a warning ticket. Then, Russell inquired about the defendants' destination. Jones responded "Memphis." When Russell asked what the purpose of the trip was, Jones stated, "Well, let me show you in the trunk." On the way to the trunk, Jones volunteered that he was originally from Memphis and that he was doing some promotional work for a record company in Beverly Hills. Russell inquired as to the duration of the defendants' stay in Memphis, and Jones replied "about a week." After rummaging through the trunk, Jones handed Russell a CD, explaining that it was a promotional CD produced by Sage Stone Entertainment ("Sage Stone"). At approximately, 12:02 p.m.,

Russell directed Jones to return to his seat in the car.

Thereafter, Russell instructed Daniel to sit in the back of the patrol car. Russell and Ralston then took seats in the front and initiated a conversation with Daniel concerning the issuance of the warning ticket. As Russell was filling out the warning citation, he asked Daniel where he and Jones were going to be staying in Memphis. Daniel explained that Jones had family in Memphis and that if they did not stay with family, then they would go to a hotel. Russell then asked for a second time who had rented the car for Daniel. Daniel responded that his mother had. Russell informed Daniel that the rental agreement did not state that there were any additional authorized drivers, to which Daniel explained that the "insurance" said it was permissible to complete the agreement in that fashion. At 12:04 p.m., Russell requested Ralston to run a criminal history check on Daniel. After Ralston forwarded Daniel's information to the dispatcher, the dispatcher instructed to standby. Russell continued with the questioning and again asked Daniel what company he was with, to which Daniel replied, "Street Institute." Daniel further explained the nature of his relationship with the company and that he managed a singer named Tracy. Around this time, Russell asked Daniel if he had ever been arrested. In response, Daniel stated that he had been arrested for possession of crack cocaine.

While awaiting for the response from the dispatcher, Russell exited the patrol car and again approached Jones and requested

4

identification. As Jones was retrieving his wallet, Russell inquired as to the nature of Daniel's business dealings. Jones explained that Daniel worked part-time with Jones's company on promotions. Upon further questioning, Jones responded that Daniel was his son-in-law's brother. At 12:09 p.m., Russell obtained Jones's California driver's license. Russell then asked whether Daniel actually managed anyone, and Jones replied that Daniel only did promotional work. Russell and Jones communicated for a few more moments about Jones's promotional trips with Daniel. Thereafter, Russell advised Jones that the rental agreement did not list any additional drivers, but indicated that this oversight was "alright." He then told Jones to sit down in the rental car. During the time Russell spoke with Jones, the dispatcher responded, and Ralston requested the dispatcher to run criminal history/wanted checks and driver's license verification on Daniel.

When Russell returned with Jones's driver's license to the patrol car at 12:10 p.m., the dispatcher advised that it could not completely hear the information Ralston had given because of the wind. Hence, Russell had Daniel close the back door of the patrol car. Ralston then repeated the information about Daniel and requested the appropriate checks as to Jones. Russell again inquired as to the name of Daniel's company, how long Daniel had been with them, and his relationship with Jones. Again, Daniel responded "Street Institute." Moreover, Daniel clarified that Jones was not really his uncle, but his brother's father-in-law.

5

Russell next turned to questioning Daniel about his prior arrest. Daniel explained that he was currently involved in a drug diversion program and that upon completion of the required classes, the possession charge would be dismissed.

At 12:14 p.m., the dispatcher reported that neither Daniel or Jones had a criminal history and that both drivers' licenses were current. At 12:15 p.m., Russell exited the patrol car and returned Jones's driver's license. Russell continued to question Jones, asking him where the defendants were going to stay in Memphis, how long Daniel had been with Jones's company, the nature of the defendants' business relationship with Sage Stone, and the relationship between Sage Stone and Street Institute. Jones responded accordingly and volunteered to show Russell a compact disk with the name of both Street Institute and Sage Stone on the label.

Without accepting Jones's offer, Russell returned to the patrol car. He then asked Daniel if there were any narcotics in the car. Daniel replied in the negative. The time was 12:17 p.m.[1] Notwithstanding Daniel's answer, Russell asked Daniel if Ralston could "take[] a look in the car." Daniel replied in the affirmative. Nearly a minute after obtaining consent, Russell returned Daniel's rental car agreement, but he still retained

---

[1]The magistrate judge's Report and Recommendation indicates the time as 12:16 p.m., but the videotape clearly shows the time to have been 12:17 p.m.

6

Daniel's driver's license and the warning citation.

Thereafter, Ralston approached Jones and asked him to join Daniel in the back seat of the patrol car. Ralston then began a search of the luggage in the trunk of the car and the trunk itself. At 12:22 p.m., Ralston motioned Russell to take a look in the trunk, having found what appeared to be a bundle of narcotics under the trunk's carpet lining. As a result, Daniel and Jones were taken out of the patrol car, handcuffed, and then returned to the back seat of the patrol car. The officers continued with the search of the car with the aid of a screwdriver and discovered additional narcotics. During this search, Daniel and Jones made allegedly incriminating remarks that were surreptitiously recorded by the patrol car's microphone. At 12:44 p.m., the officers placed Jones under arrest and warned him of his *Miranda* rights. At 12:46 p.m., the officers placed Daniel under arrest in the same manner.

Both Daniel and Jones were indicted for: 1) conspiracy to possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) & 846; 2) possession of cocaine base, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(A) and 18 U.S.C. § 2; and 3) possession of cocaine, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C) and 18 U.S.C. § 2. Daniel and Jones both filed motions to suppress evidence, which were referred to a magistrate judge. An evidentiary hearing was held on the motions, and the magistrate judge entered separate Reports and

7

Recommendations ("R&Rs") denying the defendants' motions. Both defendants objected to the R&Rs, but the district court overruled the objections and adopted the R&Rs. Thereafter, Daniel entered a conditional plea of guilty to Count One of the indictment pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure. He was sentenced to a term of 135 months imprisonment, to be followed by a five-year period of supervised release. On the government's motion, the district court dismissed the other two counts. Jones, on the other hand, went to trial before a jury. After the government rested its case, Jones moved for judgment of acquittal, which motion the district court denied. He reurged his motion before presentation of the jury charge, but the district court deferred ruling on that motion. The jury returned a guilty verdict on all three counts, and Jones again moved for judgment of acquittal. The district court denied that motion and later sentenced him to 151 months of imprisonment and a five-year term of supervised release.

Both Daniel and Jones timely filed notices of appeal.

## II. DISCUSSION

In their briefs, both Jones and Daniel primarily argue that the district court erred in failing to suppress evidence obtained from the traffic stop. They maintain that their detention was prolonged and unreasonable, violating the Fourth Amendment, and that, therefore, any resulting contraband was fruit of the

8

poisonous tree and should have been excluded.  *See **United States v. Dortch***, 199 F.3d 193, 197-98 (5th Cir. 1999).

A.    Standard of Review

When considering a ruling on a motion to suppress, we review questions of law de novo and factual findings for clear error.  ***Id.*** at 197.    Furthermore, we view the evidence in the light most favorable to the party that prevailed in the district court.  ***Id.***

B.    The Seizure Was Unreasonable And Violated The Fourth Amendment

Under the Fourth Amendment, the government violates a defendant's constitutional rights by executing a search or seizure without probable cause.  ***United States v. Lee***, 898 F.2d 1034, 1039 (5th Cir. 1990).    When a warrantless search or seizure is conducted, the burden shifts to the government to justify the warrantless search.  ***United States v. Chavis***, 48 F.3d 871, 872 (5th Cir. 1995).

The stopping of a vehicle and the detention of its occupants is a seizure within the meaning of the Fourth Amendment.  ***United States v. Shabazz***, 993 F.2d 431, 434 (5th Cir. 1993).    But where there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime, limited searches and seizures are permissible under the Fourth Amendment despite the lack of probable cause.  *See **Lee***, 898 F.2d at 1039 (referring to the reasonable suspicion standard enunciated in ***Terry v. Ohio***, 88 S. Ct. 1868 (1968)).    To determine if a seizure has exceeded the

9

scope of a permissible *Terry* stop, we must undertake a two-step inquiry: 1) whether the officer's action was justified at its inception; and 2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place. *See* **United States v. Kelley**, 981 F.2d 1464, 1467 (5th Cir. 1993).

Here, the defendants do not challenge the initial stop for violating the speed limit. Moreover, they recognize that because the stop was valid, the officers had every right to request the defendants' licenses and the registration or rental papers for the car and to run a computer check on those documents. **Dortch**, 199 F.3d at 198. Rather, the defendants question the officers' satisfaction of *Terry*'s second prong, asserting that the officers' continued detention after the completion of the computer check was unreasonable under the circumstances and exceeded the scope of the initial stop. Based on that violation, the defendants charge that the cocaine, cocaine base, and the recorded statements should have been suppressed.[2]

The facts and legal issues presented in the instant case are similar to those in **United States v. Dortch**, 199 F.3d 193 (5th Cir. 1999), which was issued after the district court denied the motions

---

[2]Because the defendants' primary basis for contesting the district court's failure to suppress the narcotics was that the narcotics were the fruit of an unreasonable seizure, we need not address the government's contention that the defendants' lacked standing to challenge the search of the vehicle. *See*, *e.g.*, **Dortch**, 199 F.3d at 197 & n.4.

to suppress and entered the judgments of conviction in this case. In *Dortch*, the defendant and his passenger were traveling in a rental car and were stopped by police because they had been driving too close to a tractor-trailer. *Id.* at 195. The rental papers indicated that neither the defendant or his passenger had rented the car or were authorized drivers. *Id.* at 195-96. During the stop, the police officers asked questions of the defendant and his passenger. The defendant and the passenger gave inconsistent answers about the defendant's relationship with the person who had rented the car. *Id.* at 196. Moreover, the defendant stated that he had been in Houston the past two days, although the rental papers indicated that the car had been rented the day before in Pensacola, Florida, home of the defendant. *Id.* In addition to the questioning, the officers patted down the defendant, looking for weapons. *Id.* at 195-96. Furthermore, while the officers awaited a computer check of the defendant's driver's license and the rental car, the defendant consented to a search of the car's trunk, but declined a search of the rest of the vehicle. *Id.* at 196.

Thereafter, the officers told the defendant that he would be free to go after the computer checks were completed but that the car would be detained by the officers so that a canine search could be performed. *Id.* Again, one of the officers patted down the defendant, and nothing was found. *Id.* When the computer check came back, one of the officers questioned the defendant about his

11

record but did not inform him that he could leave. *Id.* A few minutes later, the canine unit arrived, and the officers then told the defendant that there were no outstanding warrants. *Id.* Nevertheless, they told the defendant that a canine search would be performed. *Id.* Ultimately, the dog alerted to the driver's side of the car, but no drugs were found. *Id.* Due to the alert, however, the officers again patted down the defendant after allegedly receiving a third consent. *Id.* This time drugs were found on the defendant's body. *Id.*

In *Dortch*, we held that the defendant's Fourth Amendment rights had been violated when the detention extended beyond the completion of the computer check because, at that point, the basis for the initial stop had been discharged. *Id.* at 198. Although the government argued that the canine unit had arrived within moments of the completion of the computer check and, thus, the defendant had not been unreasonably detained, we concluded otherwise. *Id.* at 198-99.

Similar to *Dortch*, the computer checks in the instant case were completed before the search of the vehicle occurred. At least three minutes transpired from the response by the dispatcher to the time that Russell asked for consent to search the car. Except for obtaining Daniel's signature, Russell had completed the warning citation. But instead of obtaining Daniel's signature and returning his driver's license and rental agreement, Russell chose

12

the more dilatory tactic of exiting the car, returning Jones's identification papers before doing the same for Daniel, and, most importantly, repeating to Jones the same questions that were asked of him before. After the computer checks were finished, any delay that occurred with respect to the warning citation being meted out was due to the officers' action or inaction. The basis for the stop was essentially completed when the dispatcher notified the officers about the defendants' clean records, three minutes before the officers sought consent to search the vehicle. Accordingly, the officers should have ended the detention and allowed the defendants to leave. And the failure to release the defendants violated the Fourth Amendment. The district court erred by not so holding.

C.  There Was No Reasonable Suspicion

In response to the defendants' contention that the seizure was prolonged and unreasonable, the government argues that the officers had reasonable suspicion to justify the continued detention of the defendants. An officer may temporarily detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The suspicion required to justify such a detention need not rise to the level of probable cause but must be based on more than an unparticularized suspicion  or hunch. *Id.* In determining whether reasonable

13

suspicion existed to justify the defendants' continued detention, we must look at the totality of the circumstances and consider the collective knowledge and experience of the officers involved. *United States v. Holloway*, 962 F.2d 451, 459 & n.22 (5th Cir. 1992).

Here, Russell raised three bases for his reasonable suspicion. First, he pointed to the defendants' allegedly inconsistent answers with respect to questions surrounding the defendants' place of employment. Second, Russell testified that the defendants gave contradictory responses about the precise job that Daniel had. Third, Russell stated that he also became suspicious from Daniel's acknowledgment that he had previously been arrested on a crack cocaine charge.

In *Dortch*, we found no reasonable suspicion of drug trafficking despite the confusion as to the relationship of the defendant to the proper renter of the vehicle, the defendant's absence as an authorized driver on the rental agreement, the allegedly inconsistent answer about the defendant's stay in Houston, and the supposed nervousness of the defendant. Compared to the facts in *Dortch*, Russell's bases for reasonable suspicion in this case are even less suggestive of reasonable suspicion and are at best trivial. Jones explained to Russell the discrepancy between Sage Stone and Street Institute, the two names dropped by Jones and Daniel, respectively, as their place of employment.

14

Jones specifically stated that Street Institute had folded, that Sage Stone had picked up Street Institute's records, and that Russell could examine a CD in the trunk that would show the two entities together. And contrary to Russell's testimony that Daniel's and Jones's statements about Sage Stone and Street Institute aroused his suspicions, the videotape and transcript reflect that Russell understood the situation between the two record companies and was not overtly troubled by any alleged discrepancy. Indeed, Russell decided against examining the CD that Jones offered to show him. As for the allegedly inconsistent statements about Daniel's job, they do not amount to reasonable suspicion about drug trafficking. Daniel stated that he did some promotional work and managing. But when asked about Daniel's work with the record company, Jones replied that Daniel only did promotional work and no managing. Nonetheless, whether Jones said that Daniel did not manage is immaterial and does not raise any suspicions. Jones's statement merely shows that he does not know everything about Daniel's work other than promoting. Finally, Daniel did acknowledge having been arrested, but arrest alone does not amount to reasonable suspicion. *See*, *e.g.*, **Dortch**, 199 F.3d at 196, 199 (finding no reasonable suspicion notwithstanding defendant's criminal record); **United States v. Lee**, 73 F.3d 1034, 1040 (10th Cir. 1996). Consequently, we hold that there was no reasonable suspicion of drug trafficking, or any other crime, to

15

further detain the defendants.

D.    The Consent Did Not Dissipate The Fourth Amendment Violation

The government contends that even if the detention had been prolonged and unreasonable, Daniel's subsequent consent remedied any Fourth Amendment violation.  Although the officers' detention of the defendants exceeded the scope of a permissible *Terry* stop, a subsequent "'[c]onsent to search may, but does not necessarily, dissipate the taint of a [prior] fourth amendment violation.'" *Dortch*, 199 F.3d at 201 (quoting *United States v. Chavez-Villareal*, 3 F.3d 124, 127 (5th Cir. 1993)).

When we evaluate consent given after a Fourth Amendment violation, the admissibility of the challenged evidence turns on a two-pronged inquiry: 1) whether the consent was voluntarily given; and 2) whether the consent was an independent act of free will. *Chavez-Villareal*, 3 F.3d at 127.  "The first prong focuses on coercion, the second on causal connection with the constitutional violation."  *Id.*

We examine whether consent was voluntarily given under a six-factor test.  *Shabazz*, 993 F.2d at 438.  Those factors are: 1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with the police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no

16

incriminating evidence will be found.  *Id.*  No single factor is dispositive.  *Id.*  "The government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary." *Id.*

Here, the district court applied the six-factor test and concluded that Daniel's consent was voluntary.  Daniel, however, argues that the consent was not voluntary because he was essentially under arrest.  For support, he notes that he was in the patrol car, that the windows and doors of the car were closed, that he was separated from Jones, and that his driver's license and rental agreement were retained by the officers.  The government counters that the doors of the patrol car were initially open and that the officers asked Daniel to close them only after the dispatcher could not hear the information being relayed by the officers because of the street noise.  Furthermore, the government maintains that Russell did not ask for consent in an aggressive or coercive manner, that Daniel appeared reasonably intelligent and capable of understanding the request to search the vehicle, that Daniel had cooperated with the officers throughout the stop, and that the drugs were in an inconspicuous location, suggesting that Daniel may have believed that the narcotics would not be found.

We realize that the patrol car's doors were initially open, but at the time Russell asked Daniel for consent, the doors were closed and Daniel was essentially locked inside the patrol car.

17

Moreover, one could infer coercion from the officers' retention of Daniel's driver's license and rental agreement. On the other hand, as the government correctly argues, many of the other factors militate in favor of a finding of voluntariness. We need not belabor the point, however, as it is clear that the government failed to prove that the consent was an independent act of free will and that the district court erred by not considering the second prong of the consent inquiry, which is required when a constitutional violation has preceded the consent. *See* **Chavez-Villareal**, 3 F.3d at 128; **Dortch**, 199 F.3d at 202 (citing **Chavez-Villareal**).

To determine whether the consent was an independent act of free will and, thus, broke the causal chain between the consent and the illegal detention, we must consider: 1) the temporal proximity of the illegal conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the initial misconduct. **Id.** In **Dortch**, we found against the government and concluded that a close temporal proximity existed between the illegal conduct and the consent because the detention of the defendant continued until the officers had sought the defendant's consent to search his person a third time. **Id.** Likewise, in the present case, there was a close temporal proximity between the illegal detention and Daniel's consent because the detention that became prolonged and unreasonable after the computer

18

checks were completed continued up to the time of Daniel's consent. Second, "no circumstances intervened between the detention and the consent, and there is no reason to think that [Daniel] believed he was free to go during that time." *Id.* Indeed, in *Dortch*, we did not believe the defendant could leave the scene of the stop, notwithstanding the officers' statement that the defendant could leave without the car. *Id.* Similarly, in *Chavez-Villareal*, we held that instead of being an intervening circumstance, the fact that the border patrol agent had retained the defendant's alien registration card when he asked for consent merely reinforced the agent's authority and, hence, the illegal stop that occurred less than fifteen minutes before. *Chavez-Villareal*, 3 F.3d at 128. Although the agent told the defendant that he could refuse to consent to the search, we believed that the refusal seemed pointless by that time. *Id.* Considering our prior holdings, we can hardly say that Daniel had any more belief that he could go free when the officers never told him that he could leave but instead retained his driver's license, the warning citation, and the rental agreement and had him essentially locked up in the back of the patrol car. As for the third factor, the detention may not have been flagrant, but it is clear that the purpose of the detention was to obtain consent to search vehicles for narcotics. The officers were on a drug interdiction patrol in the Amarillo area. Additionally, the officers appeared to knowingly prolong the

19

detention because they purposefully chose to give Jones, not Daniel, his identification documents first despite the fact that they could readily have given Daniel his documents back first, as he was in the car with the officers when the computer checks came back clean.

In sum, even if the district court validly concluded that Daniel had voluntarily consented to the search, we believe that the consent was not valid because the causal chain between the illegal detention and Daniel's consent was not broken. Hence, the search was nonconsensual. *See, e.g., **Dortch***, 199 F.3d at 202.

E.   Fruit Of The Poisonous Tree

Under the fruit-of-the-poisonous-tree doctrine, "all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." **United States v. Rivas**, 157 F.3d 364, 368 (5th Cir. 1998). The government does not offer anything to show that there was a break in the chain of events. Because we find that the prolonged detention violated the Fourth Amendment and that Daniel's consent did not cure the

violation, the narcotics and the taped conversation must be suppressed and the convictions and sentences vacated.[3]

### III. CONCLUSION

For the foregoing reasons, we vacate Jones's and Daniel's convictions and sentences and remand the cases for trial without the illegally seized drugs and taped conversation.

---

[3]In light of our ruling, we need not address Jones's other contentions that there was insufficient evidence to convict him of the three counts and that the district court erred in overruling his motions for judgment of acquittal.

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:

I write to express disagreement with the two basic premises of the majority opinion: that there was no reasonable articulable suspicion after the dispatcher completed the computer checks on Jones and Daniel, and that Daniel's consent to the search of the trunk of the car was invalid.

The majority opinion holds that the initially proper roadside detention of Jones and Daniel should have ended when the dispatcher returned negative checks on their criminal histories and driver's license verifications. Once these computer checks were completed, the majority reasons, the purposes of the investigatory stop were fulfilled and the officers were constitutionally required to permit Jones and Daniel to leave because the officers lacked a reasonable articulable suspicion that criminal activity was afoot. I concur insofar as this is the result required by our opinion in *United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999). In *Dortch*, we held that a proper investigatory stop of a rental car occupied by a driver and passenger not listed on the rental agreement became unconstitutional when the detention continued beyond the dispatcher's return of negative background checks. *See Dortch*, 199 F.3d at 199. We reasoned that the officers did not maintain a reasonable articulable suspicion of participation in drug trafficking after this point, explaining that "[e]ssentially the

-22-

government asks us to find that officers have reasonable suspicion to suspect drug trafficking anytime someone is driving a rental car that was not rented in his name. We reason, to the contrary, that the law enforcement purposes to be served by the computer check were only to ensure that there were no outstanding warrants and that the vehicle had not been stolen." *Dortch*, 199 F.3d at 199.

I am unpersuaded by the logic of *Dortch*, however, and to this extent agree with the reasoning of the *Dortch* dissent. The fact that the *Dortch* defendants, as well as the defendants in the instant case, were driving a car they were not authorized by the rental agreement to drive is a factor that should be permitted in a calculation of reasonable articulable suspicion of criminal wrongdoing. *See Dortch*, 199 F.3d at 204 ("The majority cites no authority for its conclusion that circumstances such as none of a rented vehicle's occupants being either an authorized driver of it or having any documented relation to the vehicle or the party renting it, do not give rise to reasonable suspicion of contraband trafficking.") (Garwood, J. dissenting); *United States v. $14,000 in United States Currency*, 211 F.3d 1270, 2000 WL 222587, **3 (6th Cir. 2000) (unpublished) (officers possessed a reasonable articulable suspicion where car occupants gave conflicting stories as to their destination, drove a rental car with high mileage and an expired rental agreement, one occupant was anxious and overly talkative, and one occupant had a recent criminal conviction for

drug possession).

According to the Tenth Circuit, in a case that preceded *Dortch*, "an officer may detain a driver until assured that the driver's license is valid and the driver is legitimately operating the vehicle." *See United States v. Jones*, 44 F.3d 860, 871 (10th Cir. 1995). In *Jones*, the court held that the officer never received such assurances, and that the officer's reasonable suspicion of criminal activity arose concurrent with the legitimate investigative detention. In the case of defendants Jones and Daniel, it is true that dispatch confirmed the validity of the drivers' licenses and confirmed that neither had criminal backgrounds. But such a check cannot confirm the relationship of the drivers to the rental car. To the extent that the officers were suspicious because the car was rented, and then because the occupants were not the renters, the *Dortch* rule requiring suspension of the investigation when negative computer checks are returned is illogical. I therefore concur in the majority opinion because it is consistent with the *Dortch* rule;[4] I disagree,

_____

[4]I further disagree with the majority's analysis of the remaining factors that contributed to the officers' suspicion of Jones and Daniel: (1) the defendants' inconsistent answers with respect to questions surrounding their place of employment, (2) the defendants' inconsistent answers about Daniel's job, (3) Daniel's acknowledgment that he had previously been arrested on a crack cocaine charge. The majority analyzes the suspiciousness of each of these factors, again in comparison to *Dortch*, and concludes that the detention beyond the point of the computer check was unsupported by a reasonable suspicion. It is, however, the totality of the factors that must be considered, and as stated by

however, with that rule.

I also disagree with the majority's discussion of Daniel's consent to search the trunk of the car, and accordingly dissent from that portion of the opinion. The majority holds that Daniel's consent was invalid because the government failed to prove that the consent was an independent act of free will. Before reaching the issue of the validity of the consent, however, we must first decide the threshold question of whether Daniel, as a non-owner and non-renter of the car, had a possessory interest in the car such that his consent to search was requisite.[5] *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 424 n. 1 (1978) ("[T]he proponent of a motion to suppress has the burden of establishing that his own

the Fourth Circuit, "[t]he articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." *United States v. Brugal*, 209 F.3d 353, 359 (4th Cir. 2000) (en banc). The three factors relied upon by the officers here would seem fit that criterion))indeed, such was the finding of the district court. *See United States v. Nichols*, 142 F.3d 857, 864-65 (5th Cir. 1998) (determinations of law, such as whether reasonable suspicion existed, are reviewed de novo, while findings of fact are reviewed for clear error). Given the majority's apt description of the facts of this case in comparison to those of *Dortch*, I again cannot say that they are distinguishable, and to this extent agree with the majority conclusion regarding reasonable articulable suspicion.

[5]Daniel argues that the standing issue was waived by the government when it failed to object to the findings of the magistrate report. *See Douglass v. United States Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996). Daniel's argument, however, overlooks the fact that the government prevailed before the magistrate, and thus lacked the motivation to object to any of the magistrate findings. The standing issue was raised by the government on appeal, and is thus properly before us for review.

Fourth Amendment rights were violated by the challenged search or seizure.").  This question was also presented in *Dortch*.  The dissent there noted that there is some question as to what Fifth Circuit precedent is on the proposition that an unauthorized driver of a rental car lacks standing to challenge the validity of a search.  *See Dortch*, 199 F.3d at 204-06.  The possible conflict within our circuit is well-described in the *Dortch* dissent and need not be repeated here; it is enough that Daniel has not met his burden under *Rakas* of demonstrating a possessory interest in the car, such that the majority opinion discussing the validity of his consent is premature.  I accordingly dissent.