DeMOSS, Circuit Judge,
joined by WIENER, CARL E. STEWART and DENNIS, Circuit Judges, dissenting:
Because the majority opinion neither accurately reflects the facts as they occurred in this traffic stop nor our law concerning traffic stops, I respectfully dissent. There are four aspects of the majority opinion that are the focus of my dissent. First, because the majority gives only a bare summary of the facts, I put forth a more comprehensive statement of what actually occurred during the traffic stop.[1] Second, the majority’s assertion that reasonable suspicion existed to extend the stop is not supported in either law or fact. Third, the majority misapplies the Supreme Court’s and our Circuit’s case law concerning traffic stops. Fourth, I address the dangers inherent in the majority’s opinion and the erosion of constitutional rights which it permits.

I. The Facts in the Record.

Shortly after 4:00 P.M., on Sunday, May 14, 2000, while turning his patrol car around on an overpass, Trooper Shannon Conklin of the Texas Department of Public Safety (“Trooper Conklin”) observed a late model Buick sedan northbound in the out *513 side lane following the vehicle in front of it too closely over a rise in the highway. Trooper Conklin decided to pull over this vehicle, which contained three young black males and one young black female.
After making the stop, he approached the car on foot at approximately 4:13 P.M. and asked the driver to produce his driver’s license and vehicle registration and to step out of the car and move back behind the car to an area in front of the patrol vehicle.[2] The driver complied and gave Trooper Conklin his Arkansas driver’s license and a copy of the rental agreement for the car. The driver’s license identified him as Reginald Brigham and the rental agreement identified the lessee as Dorothy Harris.[3]
Trooper Conklin testified later that while reviewing the license and rental contract, he immediately noticed that the 50-year-old woman who had rented the car was not present, and this aroused his suspicion that the car might be stolen. Standing in the ditch in front of the patrol vehicle, Brigham asked why he had been pulled over and Trooper Conklin explained that Brigham was following too closely and Trooper Conklin thought the passenger in the front seat may not have been wearing a seatbelt. Instead of promptly initiating a computer check on Brigham’s driver’s license or the car’s license plate and papers, which would be a means of investigation that was likely to confirm or dispel suspicion about the car being stolen quickly, Trooper Conklin began to question Brigham, asking him where he was coming from and the purpose of his travel. Brigham answered that he had been in Houston on pleasure and one of the passengers had visited family in Houston. Trooper Conklin continued, asking Brigham which part of Houston they had stayed in and where they had stayed. Brigham answered that he did not know in which part of Houston they had stayed and, after pausing for a moment, answered that they stayed at a La Quinta Inn. Trooper Conk-lin asked which part of Houston the La Quinta was located in, to which Brigham first replied that he was not sure and then said he thought it was the North Highway 59 area. Trooper Conklin then asked Brigham when he had arrived in Houston; Brigham said Friday. Trooper Conklin persisted, asking Brigham to specify what time on Friday he had arrived. Brigham responded that they had arrived Friday morning. After three to four minutes of this questioning, Trooper Conklin turned to the rental agreement and asked Brigham who had rented the car. Brigham responded that his mother, Dorothy Harris, had rented it. Trooper Conklin asked where she was; Brigham told him that she was in Arkansas.
Trooper Conklin later testified that he became suspicious because: (1) the woman who rented the vehicle listed her age as 50 and thus could not have been in the car; and (2) Brigham did not share the same last name as the person who rented the car. Despite noticing the renter’s age and last name, however, Trooper Conklin testified at the suppression hearing that he did not notice that: (1) the address on Brigham’s driver’s license was the same as the home address listed by Harris on the rental agreement; or, (2) at 50, Harris was of an age that she could be Brigham’s mother. Trooper Conklin also testified at the suppression hearing that Brigham seemed *514 nervous, that his hands were shaking, and that he tended to answer a question with a question.[4]
Next, Trooper Conklin asked Brigham to point out the passenger who had family-in Houston, and also asked if Brigham had any weapons. Brigham appeared to indicate it was Brandon Franklin, who was seated in the back seat, that had family in Houston; Brigham also responded that he had no weapons. This was just after 4:17 P.M. and Trooper Conklin remarked at this time that he wanted to find out in which part of Houston the friend had family.[5] Trooper Conklin approached the car, asked Franklin to step out of the vehicle and go in front of the ear off the shoulder and into the grass, and requested Franklin’s driver’s license. The license, which later turned out to be fictitious, identified Franklin as Siraerease Brooks. Trooper Conklin began to ask Franklin the same battery of questions that he had asked Brigham. Trooper Conklin first asked where they were coming from. Franklin responded that they had been in Houston and had gone to see an Isley Brothers concert. Trooper Conklin asked when they went to the concert; Franklin said Friday night. Trooper Conklin asked how long they had been in Houston, and Franklin said they had been there a couple of days. Trooper Conklin asked what day and time they had arrived. Franklin initially said Friday late afternoon or evening, but then stated that he was not exactly sure of their arrival time. Trooper Conklin continued by asking Franklin whether he stayed with friends or family. Franklin said they had stayed at a hotel. Trooper Conklin asked which hotel; Franklin said a La Quinta, as had Brigham. Trooper Conklin asked how often Franklin went to Houston and whether he knew anyone there. Franklin responded that he did not go there often and that he knew “a couple of girls” in Houston that he had met at a college function. Trooper Conklin never specifically questioned Franklin if he had family in Houston.
Between 4:19 and 4:20 P.M., Trooper Conklin next approached the vehicle and asked similar questions of the remaining two occupants, Quincy Perry and the young female who had no identification. Trooper Conklin asked where they were coming from, and whether the visit was for business or pleasure. Perry responded that they had been in Houston for pleasure. Trooper Conklin asked how long they had been there, and Perry said a couple of days. Trooper Conklin asked which day they had arrived, and Perry initially responded that they had arrived Friday morning, but the woman suggested that perhaps it was Saturday morning. Perry then stated that they had stayed one day and two nights. When Trooper Conk-lin indicated that they could not have arrived Saturday morning and stayed two nights, Perry seemed to indicate that they had left home Thursday night and arrived in Houston Friday morning.[6]
*515 Finally, at 4:21 P.M., after almost eight minutes of questioning the driver and the three passengers about matters unrelated to the basis for the traffic stop, i.e., following too close, and unrelated to the circumstance of being in the rental car, Trooper Conklin returned to his patrol car to radio in the personal and rental car identification information. Almost immediately, the dispatcher reported that the rental car had not been reported stolen. Then for nearly five minutes there was silence and no activity during which Brigham stood in the ditch behind the rental car, Franklin waited in the ditch in front of the rental car, the other passengers remained in the rental car, and Trooper Conklin waited in his patrol vehicle to hear back from his radio contact on the driver’s licenses he had collected. While waiting, Trooper Conklin recorded orally on the videotape a message to himself that: (1) as to the rental agreement, the subjects were neither 25 years old nor listed on the rental agreement (Harris had rented the car); (2) the subjects seemed nervous (hands were shaking) and neither Brigham nor Franklin had made eye contact with Trooper Conklin; (3) all four individuals appeared to lack legal standing as to the vehicle because they were not listed as authorized drivers; and (4) they had conflicting stories about their arrival time in Houston and who they had visited there.
At 4:29 P.M., eight minutes after receiving radio contact from Trooper Conklin, the dispatcher reported that: (1) Perry and Brigham had some criminal activity in their backgrounds, but their licenses were clear and criminal details were unavailable; and (2) the license Franklin offered was likely fictitious.
Then, Trooper Conklin emerged from his car and aggressively asked Brigham what Franklin’s name and age was. After initially not understanding Trooper Conk-lin’s question, Brigham responded that his first name was Brandon, and thought his full name was Brandon Franklin. Trooper Conklin then confronted Franklin. Franklin initially tried to maintain the fake identity but then admitted that his name was Brandon Franklin. Trooper Conklin then asked for Franklin’s wallet and searched it but found nothing.[7] Thereafter, around 4:33 P.M., Trooper Conklin called in the new identification and waived over a local Nacogdoches police car for backup. He briefed the local police officers on the situation, and remarked to the officer that he was going to try to get consent to search but would search the vehicle anyway because none of the four had standing to protest.[8]
After speaking to the local police, Trooper Conklin issued Brigham a written warning for driving too close, which Brigham had to sign. This was at 4:34 P.M. It is unclear from the videotape whether Trooper Conklin returned Brigham’s driver’s license and the rental agreement to him, but Trooper Conklin testified at the suppression hearing that he returned the license. There is no testimony about what happened to the rental agreement. The record is clear that Trooper Conklin launched into his consent to search request immediately after Brigham signed the warning *516 citation. At about 4:35 P.M., 21 minutes after making initial contact with Brigham, Trooper Conklin informed Brigham that one of his jobs is to patrol for contraband. He asked for consent to search, which Brigham gave. Trooper Conklin proceeded to pat-down all the car’s passengers, told Brigham to relax and wait over in the grassy area of the ditch, and told all the other passengers to step over to the grassy area and sit down; he later instructed them not to talk to each other. The local officers kept watch over Brigham and the others while Trooper Conklin searched the passenger compartment and trunk of the vehicle. Trooper Conklin opened a cooler in the trunk and then opened a gallon-sized opaque plastic fruit drink container and saw and smelled what he thought was codeine. The record indicates Trooper Conklin also found a half-empty soda bottle of codeine. At 4:43 P.M., Trooper Conklin with the assistance of the local officers placed Brigham and all the passengers under arrest.

II. No Particularized and Objective Basis for Reasonable Suspicion Based on a Totality of the Circumstances.

The majority correctly restates the law that courts may not scrutinize the motives behind otherwise permissible police actions. Whren v. United States, 517 U.S. 806, 811-13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). But in my view, the majority is incorrect in its implied conclusion that it therefore follows that courts may not look at the totality of the circumstances to determine as to what illegal activity there was reasonable suspicion of and eliminate any suspicion that is not supported by the facts, i.e., that is not reasonable.[9] The majority insists that Supreme Court precedent supports the propositions that: (1) this Court may hold that there was reasonable suspicion because Trooper Conklin could have believed the car was stolen even though it had not been reported stolen and even though there were no other facts indicating the likelihood it was stolen; and (2) this Court must let Trooper Conk-lin draw such an inference in support of reasonable suspicion even if such an inference is objectively unreasonable. Proposed Majority Opinion at 509 (citing United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). What the Supreme Court precedent cited by the majority actually states is “[w]hen discussing how reviewing courts should make reasonable-suspicion determinations, [the Supreme Court] ha[s] said repeatedly that [the courts] must look at the ‘totality of the circumstances’ of each case to see whether the detaining officer has a ‘particularized and objective basis’ for suspecting legal wrongdoing.” Arvizu, 534 U.S. at 273,122 S.Ct. 744.
The majority opinion discounts the objective facts and Trooper Conklin’s particularized findings, both of which indicate there was no reasonable suspicion the car was stolen and there was no other particularized or objective reasonable suspicion of wrongdoing. The computer check of the car’s license registration indicated it had not been reported stolen. Further, the record clearly supports the fact that Brigham told Trooper Conklin his mother rented the car; Harris and Brigham were of *517 the ages that they could be a mother and son, respectively; and Brigham’s address matched the address of Harris on the rental papers. To the extent some of these facts were overlooked by the district court, I would find the district court to have clearly erred. Most importantly, while waiting for the results of the driver’s license checks to return, Trooper Conklin recorded orally on the videotape a message to himself that: (1) “as to the rental agreement, the subjects were ’neither 25 years old nor listed on the rental agree-' ment (Harris had rented the car)”; (2) “the subjects seemed nervous (hands were shaking) and neither Brigham nor Franklin had made eye contact with Trooper Conklin”; (3) “all four individuals appeared to lack legal standing as to the vehicle because they were not listed as authorized drivers”; and (4) “they had conflicting stories about their arrival time in Houston and who they had visited there.”
The majority states that “[t]he panel’s concern that questioning unrelated to the purpose of a traffic stop may unconstitutionally extend a detention is valid, in abstract terms, but not on the facts of this case.” Proposed Majority Opinion at 511. Not true. Rather, it is the majority’s concern that the car could have been stolen even though the car was not reported stolen that is valid in the abstract, but not on the facts of this case, where such a conclusion is belied by what occurred in terms of the “clean” computer check, by the stop7 ping officer’s clear indication of what he had suspicions of, and the lack of a particularized and objective suspicion of any other illegal activity.
Applying the proper standard of review that gives due respect to the officer and his experience but does not provide the officer with a carte blanche to make non-particularized and non-objective inferences, the facts indicate Trooper Conklin had no reasonable suspicion about car theft and could have had no reasonable suspicion of any other particular wrongdoing. He may have had some questions about the contractual rights of Brigham to drive the car — but this of course is not a matter of criminal law. Likewise, Trooper Conklin’s views on the standing of the occupants to protest a search, are wholly irrelevant to evaluating reasonable suspicion of car theft. Further, not only were there no facts on which to base a reasonable suspicion that the car was stolen, once the computer check indicated the ear had not been reported stolen, but our case law also indicates the other facts — nervousness, lack of eye contact, the authorized driver not being present, and some inconsistent responses to detailed travel questions — are insufficient to support reasonable suspicion of drug trafficking. United States v. Santiago, 310 F.3d 336, 342 (5th Cir.2002); United States v. Valadez, 267 F.3d 395, 396-99 (5th Cir.2001); United States v. Jones, 234 F.3d 234, 241-42 (5th Cir.2000); United States v. Dortch, 199 F.3d 193, 199-200 (5th Cir.1999).[10]
Our Circuit’s case law holds that “[t]he suspicion required to justify such a detention need not rise to the level of probable cause but must be based on more than an unparticularized suspicion or hunch.” Jones, 234 F.3d at 241 (emphasis added). Further, the detention’s scope must be strictly tied to the particularized suspicion justifying the detention in the first place. Dortch, 199 F.3d at 199. The majority opinion disregards these requirements and simply concludes that Trooper Conklin had reasonable suspicion — but never says of what. As indicated, there was no reason *518 able suspicion to support the belief the car was stolen and no other facts justifying a continued detention. In ignoring the facts of the case and our precedent, the majority opinion errs in two respects. First, according to the majority, the Fourth Amendment only requires reasonable suspicion of some non-specific wrongdoing. Second, the majority suggests that several objective facts, including a negative computer check, cannot extinguish this nonspecific suspicion.
The first error is clearly contrary to this Circuit’s precedent. See Jones, 234 F.3d at 241. Unfortunately, the majority does not address the requirement that reasonable suspicion be of particularized wrongdoing based on objective facts. The second error of the majority opinion is in direct contradiction to what was the well-established rule in this Circuit. See, e.g., id.; Dortch, 199 F.3d at 198-99; see also United States v. Shabazz, 993 F.2d 431, 436 (5th Cir.1993) (noting that the detention following a stop must be tailored to its underlying justification and that, once an officer conducts a pat-down search of an individual suspected only of carrying a gun, the officer, upon finding no weapon, may not further detain the person to question him because there is no longer an underlying justification). Dortch and Jones at least stand for the proposition that when an officer has reasonable suspicion of a stolen car, questioning after the completion of a negative computer check unreasonably extends the detention. This proposition implies that a negative computer check can definitively dispel reasonable suspicion of auto theft in the absence of particularized and objective facts that would indicate a reasonable suspicion of auto theft still exists.
Accordingly, under our law prior to the majority’s opinion, the stop could not be extended beyond the checking of the license and registration.

III. The Logical Application of Traffic Stop Precedent.

The majority indicates that to hold, as the panel opinion did, that the stop was unreasonably extended creates an “absurd” rule of law that somehow requires an officer to immediately obtain the driver’s license and registration and initiate relevant background checks before questioning. Again, not true. The actual panel holding, not the majority’s interpretation thereof, was that in the absence of reasonable suspicion an officer could not do an end run around this Circuit’s case law, i.e., Dortch, Jones, and Santiago, which makes it impermissible to extend the stop after the license and registration checks come back “clean,” by prolonging the detention on the front end by not running the computer check in an effort to develop reasonable suspicion when none existed.[11] Inserting an illogical sequence requirement into our law, the majority states that our case law is “about timing and sequence: after the computer checks came up ‘clean,’ there remained no reasonable suspicion of wrongdoing by the vehicle occupants. Continued questioning thereafter unconstitutionally prolonged the detentions.” Proposed Majority Opinion *519 at 511 (citing Valadez, 267 F.3d at 398-99). The majority applies the Dortch, Jones, Santiago line of cases in such a way that an officer may not unreasonably extend a traffic stop on the back end (after receiving answers to computer checks), but under the majority’s new holding in this case the officer is free to do so on the front end. The result of the majority’s opinion is plainly illogical, and is precisely the technique used by Trooper Conklin to avoid the inhibitions of Dortch, et al.
Further, in an effort to reach this result the majority takes several leaps over the established law of the Supreme Court and this Circuit concerning traffic stops.
First, the majority insists that Supreme Court case law supports the proposition that there is no constitutional stopwatch on traffic stops. Proposed Majority Opinion at 510. But such a broad statement, misses the mark the Supreme Court clearly established when it instructed courts to “examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.” United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). It seems clear to me that the delay and extended questioning in this case was not confirming or dispelling suspicions in a diligent, much less “quick,” manner.[12] This fact is made even more evident considering the one set of questions that Trooper Conklin never asked of Brigham or the passengers was when, where, and from whom did Brigham get possession of the rented car? As we have stated before, questioning on unrelated matters that extends the stop can make the detention unreasonable. United States v. Machuca-Barrera, 261 F.3d 425, 432-33, n. 21 (5th Cir.2001).
Second, the issues of whether passengers can be questioned, have their licenses checked, or be removed from the vehicle and separated, and what value any information gleaned from the passengers could be to Trooper Conklin in building an ex post facto reasonable suspicion was simply not addressed by the parties in this case and has never been decided by this Cir *520 cuit. But the majority by its sweeping opinion in this case, citing only an Eighth Circuit case permitting the questioning of passengers, has significantly expanded the scope of what is reasonable police conduct during a traffic stop.

TV. Dangers Inherent in the Majority’s Holding.

The propriety of and motivations behind the somewhat suspect initial stop in this case are not before the Court.[13] But in the words of Justice O’Connor in her dissent in Atwater v. City of Lago Vista, joined by Justices Stevens, Ginsburg, and Breyer, “it is precisely because these [subjective] motivations are beyond our purview that we must vigilantly ensure that officers’ poststop actions — which are properly within our reach — comport with the Fourth Amendment’s guarantee of reasonableness.” 532 U.S. 318, 372, 121 S.Ct. 1536,149 L.Ed.2d 549 (2001) (O’Connor, J„ dissenting). The majority opinion fails to do just that. In other words, we may be unable to remedy the initial wrong that potentially occurred in this case because of a technical or procedural rule, but we are not prevented from remedying the post-stop constitutional violation that actually occurred.
I predict that the holding in this case will lead to further infringement on the privacy of the traveling public. The majority opinion permits a law officer to make a traffic stop for a minor and innocuous traffic violation and then expand that stop into a full-blown interrogation of the driver and all occupants of the vehicle as to where they are going, where they have been, where they stayed, what they did, whom they talked to, and what events they attended. This results in a fishing expedition to see if the vehicle’s occupants have engaged in any criminal conduct other than the traffic violation for which the stop was made. The majority opinion permits the officer, during the pendency of the stop, to require the driver and all occupants of the vehicle to vacate the vehicle, be subjected to a pat-down search for weapons, and be required to separate and stay outside of the vehicle at locations specified by the officer separate and apart from each other, all without any conduct on the part of the driver or the occupants that threatens the safety of the officer in any way. Likewise, the majority opinion will now allow the officer to require each occupant in the vehicle to furnish sufficient identification to allow the officer to run a computer check on each individual without any suspicion that such occupant has corn- *521 mitted any offense. The majority opinion will permit the officer after running a computer check on the registration of the vehicle and getting a “clean” report to continue to interrogate the driver and occupants about whatever subject he chooses. All this can be done without any particularized or objectively reasonable suspicion of criminal conduct; and all of this may be conducted in whatever sequence and over whatever time frame the officer chooses. Finally, if the officer discovers any contraband in the vehicle, he may seize it so long as the officer can testify at a subsequent suppression hearing that in his opinion the driver and the occupants were nervous, would not establish eye contact with him, and gave slightly conflicting answers to the unrelated interrogating questions which were posed to them.
The majority’s opinion is another step in the direction of judge-developed law that says the end justifies the means; that makes the finding of contraband or drugs the ultimate test of reasonableness; that concludes that if law enforcement officers find drugs the search was a priori reasonable. I have previously expressed my concern about this process of diluting the protections of the Fourth Amendment by giving too broad an interpretation to what constitutes “reasonable police actions.” See United States v. Gould, 364 F.3d 578, 605 (5th Cir.2004) (DeMoss, J., dissenting) (referring to the unhooking of the protective sweep exception from the requirement of being part of the execution of an arrest warrant as effectively eliminating the need for complying with the Fourth Amendment under the guise of finding almost everything reasonable). I suppose it would be constitutionally possible for the Texas Legislature or the United States Congress to adopt a statute that says that merely by operating a vehicle on a public highway every operator shall be deemed to have consented to a search of that vehicle for contraband whenever that vehicle is stopped for any traffic violation. Because of the obvious potentials for abuse from such a law, I hope that neither the Legislature nor the Congress would ever have enough votes to enact it; but I am dead certain that the courts do not have the constitutional authority to achieve that end simply by construing what is reasonable. I respectfully dissent.

. The circumstances of the traffic stop and subsequent interrogation and search are recorded on a video tape in the record which is the best available evidence of the these facts. The summary in this dissent is close to a verbatim transcript of that videotape.

. These requests are standard operating procedure for an officer intending to issue a ticket or warning for a traffic citation.

. It is clear under our precedents that at this point Trooper Conklin effected a seizure of Brigham under our Fourth Amendment law and detention began.

.Although Brigham's responses on the videotape are slightly unclear, there were only two instances where Brigham answered a question with a question and in both instances it appeared Brigham did not understand Trooper Conklin’s question or could not hear the question because of the traffic noise from the busy highway. The videotape does not clearly show nervousness.

. The two suspicions of criminal conduct which could legitimately be in Trooper Conk-lin’s mind at this point were: (1) was the Buick car following too closely; and (2) was the Buick stolen. It is beyond my comprehension as to what relevance this subject that Trooper Conklin said he needed to explore had on either of these issues.

. Unfortunately, the videotaped conversation involving the woman and Perry is not com *515 pletely clear. But after some confusion, they seem to indicate that they left Thursday night and arrived Friday morning in Houston.

. I am not aware of any statute or rule of law which authorized Trooper Conklin to search the wallet of Franklin under these circumstances.

. At this point Trooper Conklin had not articulated any particularized objective fact which would justify a suspicion that the car was carrying any contraband which required a search.

. See, e.g., United States v. Arvizu, 534 U.S. 266, 278, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (Scalia, J., concurring) (stating that an officer’s observations of suspects as "methodical,” "mechanical,” "abnormal,” and "odd,” "are findings of fact that deserve respect. But the inference that this 'would lead a reasonable officer to wonder why they are doing this,' amounts to the conclusion that their action was suspicious, which I would have thought (if de novo review is the standard) is the prerogative of the Court of Appeals”) (emphasis added).

. As far as I can tell the majority’s opinion makes no attempt to overrule all or any part of these cases so their holdings remain in full effect.

. The majority indicates in a footnote in support of its argument that the panel opinion impermissibly requires immediate license and registration computer checks because an officer might occasionally find such checks unnecessary where the driver's license and registration appear regular via a visual inspection and the occupants answer questions clearly. Proposed Majority Opinion at 511 n.13. Of course, if an officer has a legitimate reason for stopping a vehicle and then after visually inspecting the license and registration ends the stop because the officer decides not to issue a citation, there is no unreasonable detention. Neither the majority nor the panel opinion has ever suggested otherwise.

. In Florida v. Royer, a plurality of the Supreme Court addressed the permissible scope of a Terry stop in the midst of offering several observations about the Fourth Amendment. 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). It stated, in part:
The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible. The reasonableness requirement of the Fourth Amendment requires no less when the police action is a seizure permitted on less than probable cause because of legitimate law enforcement interests. The scope of the detention must be carefully tailored to its underlying justifications.
The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer’s suspicion in a short period of time.
Id. at 500, 103 S.Ct. 1319 (citations and internal quotation marks omitted). Although this case was decided by only a plurality of the Justices, there is no indication the plurality resulted because of the discussion of general principles that relate to this case. In fact, in his concurrence, Justice Brennan explained, "I interpret the plurality’s requirement that the investigative methods employed pursuant to a Terry stop be 'the least intrusive means reasonably available to verify or dispel the officer’s suspicion in a short period of time,’ to mean that the availability of a less intrusive means may make an otherwise reasonable stop unreasonable.” Id. at 511 n. *, 103 S.Ct. 1319 (Brennan, J., concurring in the result) (internal citation omitted).

. In this case there is the unspoken issue of racial profiling. I recognize that counsel for Brigham neither challenged the initial propriety of the traffic stop for following too closely, nor did he raise an Equal Protection claim based on an impermissible racial classification (i.e., the unequal enforcement of laws based on race), nor did he raise a Fourth Amendment challenge based on an illegitimate use of race as a factor for reasonable suspicion. But in my view, the obvious facts of this case, i.e., four young African-Americans traveling in a vehicle with out-of-state license plates stopped on a public highway in East Texas by a white highway patrolman for "following too closely" and then interrogated for 20 minutes about matters unrelated to the reasons for that stop, are so suggestive of circumstances in which racial profiling typically occurs that the district court and our Court fail in our responsibility to the hundreds of our minority citizens who daily exercise their constitutional right to travel in interstate commerce without harassment when we close our eyes and minds to the reality of these circumstances. Texas now has enacted statutes prohibiting racial profiling and requiring law enforcement agencies to develop plans to eliminate the use of racial profiling and keep track of data concerning traffic stops and arrests. See Tex.Code Crim. Proc. Ann art. 2.131-137 (Vernon Supp.2004). Regrettably, these statutes were not yet effective when Brigham was stopped.