United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 26, 2003**

Charles R. Fulbruge III
Clerk

REVISED OCTOBER 23, 2003

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

———————————————

No. 02-41130

———————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ISSAC REMON GRANT,

Defendant-Appellant.

———————————————————————————

Appeal from the United States District Court
For the Eastern District of Texas

———————————————————————————

Before EMILIO M. GARZA and DeMOSS, Circuit Judges, and DUVAL,* District Judge.

STANWOOD R. DUVAL, District Judge:


Issac Remon Grant appeals his conditional guilty plea conviction for possession with

intent to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. §841(a)(1). The

plea agreement permitted Grant to appeal the court's decision denying his motion to suppress the

evidence confiscated as a result of a warrantless search of the automobile within which he was a

———————————

 District Judge of the Eastern District of Louisiana, sitting by designation.

1

passenger. Grant challenges the district court's denial of his motion to suppress, arguing that the officer who made the stop detained him for an unreasonable time, beyond the scope of the traffic stop, and that the discovery of the crack cocaine resulted from this violation of his Fourth Amendment rights.

## I. FACTS AND PROCEEDINGS

On May 28, 2000, Officer Danny Buchholtz, a member of the Jefferson County Narcotics Task Force, was on duty on Interstate 10, east of Beaumont, Texas. Buchholtz had been assigned to this task force for approximately seven years. At approximately 11:25 p.m., Officer Buchholtz spotted a black 1999 Chevrolet traveling eastbound and driving in the left lane.[1] According to Officer Buckhholtz's testimony at the suppression hearing, the black Chevrolet was traveling behind another car that was moving at a slower pace. Buchholtz saw the Chevy pass the slower car without signaling, cutting off the other driver. Buchholtz signaled to the Chevy's driver, later identified as co-defendant John Alfred Bruton, to pull over to the side of the road. At this point, the officer activated a video camera which captured the events that occurred during the stop.

Because Bruton did not pull far enough toward the shoulder of the road to be a safe distance from passing cars, Buchholtz walked up behind the Chevy and requested that the driver pull the car toward the side of the road. After Bruton parked the car safely by the shoulder, Buchholtz approached the passenger side of the car. Buchholtz noticed that the passenger, Issac Grant, was fumbling around the passenger seat. He also noticed a Doritos bag laying on the floor by Grant's leg. Worried that Grant may have been trying to conceal a weapon, he asked Grant to

---

The times used in this opinion coincide with the time as recorded on the videotape. The events actually occurred twenty minutes later than the time evidenced by the tape.

lift up his shirt.  Grant complied.

At this point the driver, Bruton, got out of the Chevy.  Buchholtz asked him for his license and explained that he pulled the car over because Bruton failed to signal a lane change.  The officer asked Bruton about his travel plans and Bruton indicated that he and Grant had been in Houston to drop off a cousin and that they had stayed there overnight.  Bruton informed the officer that the car was registered to his wife.  At 11:27 p.m. Buchholtz radioed the dispatcher to verify Bruton's license information, check his criminal history, and search for outstanding warrants.

At 11:29 p.m. Buchholtz walked to the passenger side of the Chevy and asked Grant to step out of the car.  Because Buchholtz had seen Grant fumbling around in the passenger seat, he thought that Grant may have been concealing drugs or a weapon.  Buchholtz asked Grant to put his hands on the side of the car, patted him down, but found nothing.  Buchholtz then asked Grant for his identification, but Grant did not have any form of identification with him.   Instead, Grant gave Buchholtz his name and date of birth.  Buchholtz asked Grant about his travel plans and Grant told him that he and Bruton had been in Houston to see an auto show and also went to the mall.  The officer asked if they had stayed in Houston over the weekend and Grant indicated that they had.  Buchholtz testified at the suppression hearing that because Bruton and Grant gave conflicting stories about their trip to Houston, Bruton appeared nervous, and Grant had been fumbling around in his seat as if to conceal something and also appeared nervous, he decided to request permission to search the Chevy.

At approximately, 11:30 p.m. Buchholtz approached Bruton and asked for his consent to search the car.  Buchholtz asked Bruton, "Do you care if I search the car? It's voluntary.  I'm

3

going to call a dog." Bruton responded, "Why do you want to search?" To which Buchholtz asked, "Is there dope in the car? If you don't want the search, I'll get the dog." After asking several additional times for consent to search, and receiving each time the response, "Why do you want to search?" or some variation of it, Buchholtz interpreted Bruton's responses as a denial of consent to search.

At 11:31 p.m. Buchholtz radioed for a narcotics dog, and asked Bruton and Grant to sit at the side of the road until the canine unit arrived. At around this same time, the dispatcher completed the check on Bruton. There were no outstanding warrants, but Bruton had a positive criminal history indicating a narcotics conviction. At approximately 11:31:50, Buchholtz ordered the dispatcher to check Grant's name, date of birth, and check for outstanding warrants.

At around 11:32 p.m. Buchholtz asked Bruton if he had a "bag of weed" in the car. He said to Bruton, "I'm not gonna bother about a bag of weed." Bruton admitted that he and Grant "smoked a joint" much earlier when they were in Houston and that there may be some ashes in the car.

At 11:33 p.m. Buchholtz conducted a visual search of the passenger side of the car. With the door open, he shined a flashlight in the passenger area. Buchholtz testified that he was unsure whether the odor he smelled was marijuana, but he told Grant and Bruton that the scent of marijuana was faint and that he wanted wait for a dog to find out if there were drugs in the car. At 11:34 p.m. the dispatcher called Buchholtz and informed him that there was "nothing on Grant" in Louisiana. Buchholtz testified that this indicated that the records check on Grant was incomplete and the dispatcher would check for a match and/or outstanding warrants in surrounding states.

At 11:40 p.m. and while they were waiting for the dog to arrive, Bruton suddenly got up from the side of the road, bolted toward the car, and drove away. Grant placed his body in front of the squad car to prevent Buchholtz from following Bruton. Buchholtz's partner apprehended Grant and Buchholtz began to chase after Bruton in the police car. At approximately 11:53 p.m. Buchholtz apprehended Bruton.

When Buchholtz searched the car after arresting Bruton, he noticed that the Doritos bag he had seen in the passenger compartment was missing. Suspecting that Bruton threw the bag out of the window because it contained drugs, Buchholtz asked Officer Lang, who had apprehended Grant and who had just arrived on the scene, to look for the Doritos bag. Lang found the bag along the side of the road near the Smith Road exit. The bag contained crack cocaine.

The district court denied Grant's motion to suppress and issued oral reasons at the suppression hearing. The district judge found that on May 28, 2000, Officer Buchholtz made a valid traffic stop, and that the differing stories that Grant and Bruton gave about why they were in Houston along with the traffic violation, and Grant's fumbling around in the car were sufficient reasons to arouse reasonable suspicion to detain them while Buchholtz checked their identifications. The district court found that the stop was not complete until information on Bruton, Grant, and the automobile had been returned. The court also found that Bruton's admission that he had smoked a joint and Buchholtz's detection of a faint odor of marijuana gave him reasonable suspicion to detain them temporarily until a canine arrived.

On July 19, 2002, Grant pled guilty to Count II of the First Superseding Indictment, pursuant to a plea agreement preserving his right to challenge the denial of the Motion to Suppress. That same day the district court sentenced Grant to a 151 month term of imprisonment

as to Count II, followed by 5 years of supervised release.

## II.  STANDARD OF REVIEW

When reviewing a ruling on a motion to suppress, the court reviews questions of law *de novo* and findings of fact for clear error. *United States v. Jones,* 234 F.3d 234, 239 (5th Cir.2000).  We view the evidence in the light most favorable to the party that prevailed in the district court. *Id.*

## III.  DISCUSSION

### A.  Standing

As a threshold matter, the Government renews its argument that Grant lacks standing to contest the validity of the search.  The Government contends that Grant has no standing to challenge the search of the Chevy because Grant had no privacy interest in the car.   However, we have previously held that while "the *search* of an automobile does not implicate a passenger's Fourth Amendment rights, a *stop* results in the seizure of the passenger and driver alike." *United States v. Roberson,* 6 F.3d 1088, 1091 (5th Cir. 1994)(emphasis added); *see also Jackson v. Vannoy,* 49 F.3d 175 (5th Cir. 1995).  Therefore, while a passenger of a stopped automobile does not have standing to challenge the search of a car, he does have standing to challenge the seizure of his person as unconstitutional.

**B.     Fourth Amendment Challenge**

The Fourth Amendment protects individuals from unreasonable searches and seizures. Traffic stops are considered seizures within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Jones*, 234 F.3d at 239. Because traffic stops are considered more similar to investigative detentions than formal arrests, we analyze the legality of traffic stops for Fourth Amendment purposes under the standard articulated in *Terry v. Ohio*, 392 U.S. 1 (1968).  *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).  This standard is a two- tiered reasonable suspicion inquiry: 1) whether the officer's action was justified at its inception, and 2) whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place. *Terry*, 392 U.S. at 19-20, 88 S.Ct. 1868, 20 L.Ed.2d 889; *Jones,* 234 F.3d at 240; *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir.1999); *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir.1993); *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir.1993).  In addition, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).  Once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion. "At that point, continuation of the detention is no longer supported by the facts that justified its initiation." *Shabazz*, 993 F.2d at 436.  Reasonable suspicion exists when the detaining officer "can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the search and seizure].'" *United States v. Santiago,* 310 F.3d 336, 340 (5th Cir. 2002)(citing *United States v. Thomas,* 12 F.3d 1350, 1366 (5th Cir. 1994).

7

Grant does not contest the first prong of the *Terry*-stop inquiry, that the stop was justified at its inception. Grant argues, however, that the officer exceeded the scope of the traffic stop and violated Grant's constitutional rights by continuing to detain him after the dispatcher returned a completed check on both Bruton and Grant. Grant contends that his continued detention required a separate justification because it extended beyond the scope of the original reason for the stop, the traffic violation. Grant's objection challenges the second prong of the *Terry* analysis, "whether the officer's action was reasonably related in scope to the circumstances which justified the interference in the first place." *Shabazz*, 933 F.3d at 431. When the purposes of the stop are resolved and the officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts. *United States v. Gonzalez,* 328 F.3d 755, 758 (5th Cir. 2003).

When making a reasonable-suspicion determination, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *United States v. Arivizu,* 534 U.S. 266, 273 (2002)(citing *United States v. Cortez*, 449 U.S. 411, 417 (1975)); *United States v. Neufeld-Neufeld,* No. 02-50671, 2003 WL 21540640, *2 (5th Cir. 7/8/03); *United States v. Saucedo-Munoz*, 307 F.3d 344, 351 (5th Cir. 2002); *Espinosa-Alvarado,* 302 F.3d 304, 306 (5th Cir. 2002). This allows officers to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu,* 534 U.S. at 273.

**1.     Second Prong of Terry: Did the officer detain Grant beyond the scope of the traffic stop and without reasonable suspicion?**

In his brief Grant argues that the first illegality occurred when the justification for the initial stop ended and the officer lacked authority for the continued detention of Grant. Grant contends that "[o]nce the warrant checks on the two men were returned, Mr. Grant should have been free to leave." Grant also states that "Buchholtz verified the vehicle registration and received Bruton's and Mr. Grant's warrant check by 11:35 p.m. Instead of releasing Mr. Grant and Bruton, Buchholtz continued to detain him."

As mentioned above, when the purposes of the stop are resolved and the officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts. *United States v. Gonzalez,* 328 F.3d 755, 758 (5th Cir. 2003). By 11:35 p.m., the approximate time that Grant and Bruton's information had returned, reasonable suspicion existed to justify the continued detention of Grant.

In most traffic stops that result in narcotic arrests the sequence of events leading to an arrest is crucial to finding an officer had reasonable suspicion to detain an individual. Here, the critical event is the time the officer developed reasonable suspicion to turn the initial traffic stop into a search for contraband. We find that the officer had reasonable suspicion to detain both Grant and Bruton when Bruton made incriminating statements about smoking marijuana. This admission occurred before the return on Grant's information.

Grant argues that the facts in this case are similar to those in *United States v. Dortch,* 199 F.3d 193 (5th Cir. 1999). *Dortch* also involved a traffic stop of a rental car where the defendant was traveling too close to a tractor trailer. *Dortch,* 199 F.3d at 196. During the stop, the officer

9

discovered that the defendant was not listed as an authorized driver on the rental agreement. *Id.* When the officer questioned the defendant and the passenger, they gave inconsistent stories about the defendant's relationship to the person who had rented the car. *Id.* The officer told the defendant that he would be free to leave after the check for warrants was complete, and that they would be detained until a canine search was performed. *Id.* After 15 minutes had elapsed, the results of the computer check returned, however, the officer did not inform the defendant of this fact or that he was free to go. *Id.* Approximately five minutes later, a canine search was performed and led to the discovery of cocaine in the defendant's clothing. In *Dortch* we held that the defendant's Fourth Amendment rights had been violated because the detention extended beyond the completion of the computer check. At that point the basis for the initial traffic stop had ended and the officers did not have reasonable suspicion to detain the defendant beyond the scope of the traffic stop. *Dortch,* 199 F.3d at 198.

Grant argues that he should have been released upon the completion of the computer check as the defendant was in *Dortch*. We disagree and find that *Dortch* is distinguishable from the facts in this case. In *Dortch,* we found the defendant was lawfully detained until the completion of the computer check. *Id.* The officers violated the defendant's Fourth Amendment rights when they held Dortch's driver's license and rental car papers without an additional basis of reasonable suspicion after the computer check returned. *Id.* In the instant case, however, before the computer checks returned on both men, Officer Buchholtz had reasonable suspicion to detain Grant.[2]

---

The government argues that Grant's computer check was never completed before Bruton fled. It contends that after the dispatcher reported that Grant was "clear" in Louisiana she continued to search for information on Grant in surrounding states since he did not present a valid driver's license or identification. Whether the computer

Reasonable suspicion arose from Grant and Bruton's behavior before Grant's computer check was complete, thereby legitimately prolonging the stop beyond the initial justification of the traffic stop. Officer Buchholtz testified at the suppression hearing that Bruton appeared nervous and Grant had been fumbling around in the passenger seat. Additionally, Bruton and Grant gave different stories about their stay in Houston. While these facts alone may not have been enough to justify detention beyond the return of the computer checks, under a totality of the circumstances analysis, these facts as well as Bruton's admission that the two men had smoked marijuana in the car created reasonable articulable suspicion. All of these events occurred before the computer checks were complete.

As evidenced by the videotape, Buchholtz checked Bruton's identification and criminal history at 11:27 p.m. Buchholtz received a return on Bruton at 11:31:36 p.m., and at 11:31:56 p.m. he radioed Grant's information to the dispatcher. At 11:32 p.m., while waiting for a return on Grant's information, Bruton admitted that they smoked marijuana earlier in their trip and that there might be ashes in the car. Then, at 11:33 p.m. Buchholtz looked into the car and stated that the scent of marijuana was not strong enough for him to be sure, but that he thought he could see some marijuana residue. At 11:34 p.m., three minutes after Bruton's information returned, and after Bruton's admission that the two had smoked marijuana, the dispatcher reported that she was unable to find anything on Grant in Texas or Louisiana. Thus, by the time Grant's initial information returned, Buchholtz had reasonable suspicion to believe that drugs were in the car. Further, Grant's nervousness, his furtive movements in the car, and the inconsistent stories they

check was "complete" after the first check or the subsequent checks in other states is immaterial. Officer Buchholtz developed reasonable suspicion to detain Grant before his computer check returned on the initial check and the subsequent checks.

11

gave in response to Buchholtz's questions also added to Buchholtz's reasonable suspicion that drugs may have been in the car. At 11:40 p.m. Bruton fled in the Chevy and Grant attempted to prevent the officer from chasing Bruton by lying down in front of the police car. Based on Buchholtz's seven years of experience on the force and the totality of the circumstances he had reasonable suspicion to detain Grant to search the car for drugs. This period of time, however, was interrupted by Bruton's flight and Grant's bizarre behavior of obstructing the squad car.

C.     **CONCLUSION**

Having carefully reviewed the record of this case and the parties' respective briefing and for the reasons set forth above, we conclude that the district court was correct in denying Grant's motion to suppress. We therefore, **AFFIRM** the district court's denial of the suppression motion.

HAROLD R. DeMOSS, JR., Circuit Judge, specially concurring

I concur in the result reached by my colleagues that the district court correctly denied Grant's motion to suppress; but I do so for reasons different from those relied upon by my colleagues. In my view the actions of Bruton in jumping into his vehicles and fleeing the scene of the traffic stop and the actions of Grant in lying down in front of Buchholtz's vehicle in an attempt to prevent Buchholtz from chasing Bruton each constituted events from which the police officer could reasonably infer an awareness of guilt on the part of Bruton and Grant; and these actions constituted intervening events which render moot the analysis of the validity of the traffic stop and extensions thereof. The drugs which were ultimately discovered as a result of these intervening events was cocaine (not marijuana as Trooper Buchholtz thought he smelled); and the cocaine was discovered without the use of the drug smelling dog which Trooper Buchholtz had requested come to the scene of the traffic stop, but which did not arrive before Bruton fled the scene. But for the occurrence of these intervening actions, I have serious doubts that the conduct of the traffic stop by itself would have passed the test of reasonableness which our Circuit has established.

I note particularly that Grant did not raise as an issue on appeal, and my colleagues did not decide, whether a state trooper who makes a traffic stop has the authority to require any and all passengers in that car to identify themselves and then run a computer check on those passengers as Buchholtz did on Grant in this case. My search of the statutes of the State of Texas failed to turn up any statutory provision which requires a passenger in a vehicle to carry his driver's license or any other type of identification so long as he is just a passenger. Likewise, I found no statutory provision which would attribute liability to a passenger for a traffic violation committed by the

driver, such as "failing to signal a lane change" in this case. I have doubts therefore that the reason for the initial traffic stop in this case (*i.e.,* failing to signal a lane change) gives the trooper any ground for suspicion of criminal conduct on the part of a passenger. I recognize of course that if a police officer arrests an individual that person is required to give his true name, residence address, and date of birth to the arresting officer. See Texas Penal Code § 38.02. But there is nothing in this record which would indicate that Buchholtz arrested or attempted to arrest Grant at the time of the initial traffic stop. If Officer Buchholtz had observed that Grant was not wearing his seat belt as part of the reason for the traffic stop, the officer would clearly have the right to require Grant to identify himself for purposes of writing an appropriate charge for such failure. But there is absolutely nothing in this record indicating the possibility of a seat belt violation on the part of Grant. Likewise, I recognize that Officer Buchholtz exercised the rights which our case law clearly gives him to require Grant to get out of the vehicle and be frisked for possession of a weapon in order to ensure the officer's safety during the traffic stop; but Grant did not have any weapon on his person and in my view there was no reasonable basis to support Buchholtz's initiation of a computer check on Grant. Finally, it is clear from the record in this case that Buchholtz repeatedly asked for permission from Bruton to search the vehicle, but was never able to get such permission. In attempting to persuade Bruton to consent, Buchholtz said "if you don't want the search, I'll get the dog." Finally, Buchholtz radioed for a canine unit to come to the scene of the traffic stop and instructed Bruton and Grant to sit at the side of the road until the canine unit arrived. After nine minutes of waiting for the canine unit, Bruton jumped up and fled the scene. There is nothing in the record to indicate if or when the canine unit arrived at the scene of the traffic stop. I have serious doubts that simply because Bruton refused to consent

14

to a search of the vehicle, Buchholtz had reasonable suspicion to support an extension of the traffic stop to allow time for the canine unit to come to the scene.

But all of these concerns are overwhelmed by the voluntary and independent actions of Bruton and Grant which resulted in the chase and arrest of Bruton, the search of the vehicle, and the discovery of the cocaine. Therefore, I concur.