UNITED STATES of America,

v.

**Karina ROSS(1), Ben Hur Meraz–Mejia (2), Bernardino Meraz–Mejia (3), James Francis Joseph Ross (4), Defendants.**

**No. CRIM. A. SA–05–CR–97–XR.**

United States District Court,
W.D. Texas,
San Antonio Division.

July 5, 2005.

Michael R. Hardy, Assistant United States Attorney, San Antonio, TX, for United States of America.

Fred G. Rodriguez, Attorney at Law, Victor Manuel Valdes, Attorney at Law, Molly Lizbeth Roth, Federal Public Defender's Office, George B. Dombart, Attorney at Law, San Antonio, TX, for Defendants.

## ORDER

RODRIGUEZ, District Judge.

On this day, the Court considered the Defendants' Motions to Suppress. Defendants argue that the stop of their vehicles constituted a violation of their Fourth Amendment rights. They seek to suppress all information obtained from and as a result of the stops of the vehicles in which they were riding. The Defendants further argue that they did not receive proper *Miranda* warnings during the time they spent waiting for the Border Patrol. Because there was not reasonable suspicion to stop the Jeep, the second car pulled over, the Motions to Suppress for Defendants Karina Ross, Ben Hur Meraz–Meija, and James Francis Joseph Ross are GRANTED. Because there was reasonable suspicion to stop the Buick and there was no unreasonable delay in the detention of Bernardino Meraz–Meija, the Motion to Suppress as to Bernardino Meraz–Meija is DENIED.

## FINDINGS OF FACT

1. On February 1, 2005 at around 8:00 AM, while traveling south, Jourdanton Police Officer Joe Shafer noticed two cars, a Buick and a Jeep, traveling North on Highway 16 in Jourdanton, Texas.

2. Officer Shafer "heard a loud sputtering noise like a defective muffler would make" coming from the Buick. Officer Shafer said that he then rolled down his window and as he did he saw the white Jeep Cherokee come by him. In the Jeep he saw a female looking at him who "then automatically ... snap[ed] her head back forward and concentrate[d] on the road." Officer Shafer characterized this behavior as "suspicious."

3. Officer Shafer then "turned around and proceeded to follow the white Buick. After running a license plate check on it and making sure that the vehicle had proper registration, [he] went ahead and initiated a traffic stop for the violation of the defective muffler."

4. After signaling for the Buick to stop, Officer Shafer testified that he "observed that the driver of the Buick had a slow reaction to [his] emergency overhead lights. The vehicle then started to pull over [and] as that vehicle started to pull over, [he] observed the white Jeep Cherokee also [begin] to pull over as well." Officer Shafer

testified that this led him to believe the vehicles were traveling in tandem.

5. Officer Shafer stated that he felt he had no reason to stop the Cherokee. He did, however, issue a radio transmission regarding the Jeep in which he said "find something on them to shut them down."

6. Upon approaching the Buick, Officer Shafer found "approximately six" people, including the driver, Defendant Bernardino Meraz–Meija (Bernardino). The passengers appeared to be dirty and spoke very little English.

7. Officer Shafer asked Bernardino to step out of the vehicle and they both walked to the back where Officer Shafer informed Bernardino that he pulled him over because he had a defective muffler. Bernardino acknowledged that the muffler was defective. Officer Shafer then asked Bernardino for identification and Bernardino stated that he lost his wallet. Officer Shafer observed a wallet in Bernardino's back pocket, however, and upon presenting the wallet to Officer Shafer, Bernardino stated that he only had a Mexican ID with him.

8. Officer Shafer placed Bernardino in the back of the patrol car after he failed to produce identification. Bernardino was not handcuffed at any time by Officer Shafer. Bernardino requested to use the restroom on two occasions while in the back of the patrol car and was told to "hold it." Officer Shafer also repeatedly asked Bernardino his date of birth and got several conflicting answers.

9. While Bernardino was in the back of the patrol car, Officer Shafer approached the remaining Buick passengers and asked if they had any identifi-

cation. None of the Buick's occupants produced any identification or documentation. Officer Shafer asked the passengers "if they were in the country legally or illegally and they stated that they were here illegally."

10. Bernardino produced to Officer Shafer a correct date of birth at 9:06 AM after giving several inaccurate dates. Officer Shafer then issued a traffic citation to Bernardino for "violation of no driver's license, also for no liability insurance and [he] believes [he] gave him a warning citation for having a defective muffler." [1] After issuing the citation, Officer Shafer awaited the arrival of the Border Patrol.

11. Meanwhile, Sergeant Brian Pond of the Poteet Police Department heard two radio transmissions regarding the Jeep Cherokee and the Buick. The first transmission was from the dispatcher regarding the Jeep. The dispatcher stated that "he believed that these vehicles were traveling in tandem with each other.... He asked if [Sgt. Pond] would set up and if [he] could find some reason to pull the Jeep over, that it should be checked out." The second transmission Sgt. Pond heard was a request from Officer Shafer for Border Patrol assistance with the Buick.

12. After leaving Jourdanton at approximately 8:00 AM, the Jeep arrived approximately 10 miles away in Poteet at 8:13 AM. Upon reaching the southern Poteet city limits, Sgt. Pond spotted the Jeep going thirty-five miles per hour in a fifty mile per hour zone and began following it. When the Jeep was first spotted by Sgt. Pond, it was traveling through light rain in a construction zone.

---

**1.** The government has not provided a copy of this alleged warning citation.

13. After a quarter mile, the Jeep pulled into a deserted restaurant and changed drivers. Sgt. Pond stated that he stopped shortly after the Jeep and waited until it returned to the road. He then began following it again. About a quarter mile after the Jeep changed drivers Sgt. Pond noticed that the driver "appeared to be looking for a part to be exiting off of the roadway." He then signaled for the Jeep to stop.

14. Inside the Jeep were two illegal immigrants and Defendants Karina Ross (Karina), James Ross (James), and Ben Hur Meraz–Meija (Ben Hur). Karina informed Officer Pond that the Jeep was her vehicle and it was not insured.

15. Chief Frank Leal, a Spanish speaking officer of the Poteet Police Department, was called to the scene. After ascertaining the situation, Chief Leal requested that the vehicle return to Jourdanton to await the arrival of the Border Patrol. The Jeep's driver complied. Upon arriving in Jourdanton, one of the Jeep's riders confessed to being an illegal alien.

16. The Border Patrol Agents arrived in Jourdanton at around 9:40 AM.[2] The agents arrested all of the occupants of the Buick, including defendant Bernardino who did not have documents showing his legal presence in the United States.

17. The agents also arrested most of the Jeep's occupants, including Defendants Ben Hur and Karina, the male driver, and two male passengers in the back seat. Defendant James Ross was released without charge and rearrested and formally charged on March 2, 2005.

**CONCLUSIONS OF LAW**

1. Any finding of fact herein above which also constitutes a conclusion of law is adopted as a conclusion of law. Any conclusion of law herein made which also constitutes a finding of fact is hereby adopted as a finding of fact.

2. "People have a right to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. A traffic stop is a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Thus, in order to legally stop a vehicle, a police officer must have a reasonable suspicion based on articulable objective data, that the occupants are engaged in illegal activity. *United States v. Samaguey,* 180 F.3d 195, 197 (5th Cir.1999).

3. In determining the reasonableness of a search or seizure, a two part inquiry must be made. If it is determined that "the officer's action was justified at its inception" then any continued intrusion must be shown to be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 19—20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Reasonable suspicion requires more than a mere unparticularized hunch, but considerably less than proof by a preponderance of the evidence." *United States v. Ceniceros,* 204 F.3d 581, 584 (5th Cir. 2000).

4. Factors to consider when determining whether officers have a reasonable suspicion include:

**2.** This was about one hour and forty minutes after the initial stop.

(1) proximity of the area to the border; (2) known characteristics of a particular area; (3) previous experience of the arresting agents with criminal activity; (4) usual traffic patterns of that road; (5) information about recent illegal trafficking in aliens or narcotics in the area; (6) the behavior of the vehicle's driver; (7) the aspects and appearance of the vehicle; and (8) the number, appearance and behavior of the passengers.

United States v. Samaguey, 180 F.3d 195, 198–99 (5th Cir.1999). In considering the above factors it is important to note that no single factor is determinative. Ceniceros, 204 F.3d at 584. The totality of everything known to the agents is what must be considered. Id.

**Buick Stop**

5. Texas law provides that "a motor vehicle shall be equipped with a muffler in good working condition that continually operates to prevent excessive or unusual noise." TEX. TRANSP. CODE ANN. § 547.604 (Vernon 1999). Officer Shafer testified that he heard "a loud sputtering sound" consistent with a defective muffler coming from the Buick. While a "temporary detention of individuals during the stop of an automobile by the police ... constitutes a 'seizure' of 'persons' within the meaning of the Fourth Amendment, ... the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Further, as long as there has been a traffic violation that objectively allows for the stop "the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment and comparable Texas law." Goodwin v. Johnson, 132 F.3d 162, 173 (5th Cir.1998). Thus, Officer Shafer's initial stop was justified at its inception as he had probable cause to stop the Buick for having a defective muffler.

6. Once the reason for the suspicion that motivated the initial stop has been "verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion." United States v. Grant, 349 F.3d 192, 197 (5th Cir.2003). "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Shabazz, 993 F.2d 431, 435 (5th Cir. 1993) (internal quotations omitted). Because Bernardino did not reveal his true date of birth until 9:06 AM, Officer Shafer was not able to issue a citation until 9:10 AM. Thus Bernardino's detention was proper until that time under the original suspicion for the initial stop.

7. After the citation was issued, Bernardino's continued detention until the Border Patrol arrived was proper because Officer Shafer had an additional articulable, reasonable suspicion that the passengers of the Buick were illegal aliens based on their statements that they were in the country illegally as well as their appearance. See United States v. Sharpe, 470 U.S. 675, 687–89, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (declining to place a rigid time requirement on Terry detentions and holding that a twenty minute wait for

federal agent to investigate a narcotics trafficking suspicion was not improper); *United States v. Grant*, 349 F.3d 192, 197–98 (5th Cir.2003) (finding reasonable suspicion to continue a detention where a vehicles occupants had inconsistent stories and admitted having smoked marijuana).

8. Bernardino also argues that there was a *Miranda* violation during the time he was detained until the Border Patrol arrived. The Fifth Amendment privilege against self-incrimination prohibits police custodial interrogation without a prior warning. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A person subject to an investigative detention regarding a traffic violation "is not entitled to *Miranda* warnings because he is not in custody." *United States v. Garcia*, 77 F.3d 857, 859 (5th Cir.1996). "To determine custody for *Miranda* purposes we ask whether a person in the suspect's position would have been reasonable in concluding that there was a restraint on personal movement to the degree associated with formal arrest." *Id.* at 859–60. Bernardino was detained pursuant to a traffic stop. After the citation was issued, he was further detained pursuant to reasonable suspicion until the Border Patrol agents arrived. Bernardino was placed in the patrol car but was never handcuffed or removed from the scene by Officer Shafer. Thus, Bernardino was never subject to a custodial arrest. As such, there was no *Miranda* violation.

**Jeep Stop**

9. In determining whether reasonable suspicion existed as to the stop of the Jeep, the totality of the circumstances surrounding the stop must be considered in light of the police officer's knowledge and experience. *Ceniceros*, 204 F.3d at 584.

10. The government contends that the Jeep stop was based on the following factors: (1) The initial radio transmission that the Jeep was traveling in tandem with the Buick; (2) the second transmission requesting Border Patrol assistance with the Buick; (3) Sgt. Pond's knowledge that Highway 16 is a "known smuggling route"; (4) Sgt. Pond's knowledge that "vehicles engaged in smuggling generally drive in tandem"; (5) The Jeep's speed of 35 miles per hour in a 50 mile per hour zone; (6) The Jeep's "impeding the flow of traffic at such a slow rate of speed"; (7) the Jeep pulling into a closed restaurant shortly after Sgt. Pond began to follow it; (8) the driver change during the stop at the restaurant; (9) the driver's actions in "looking for a place to exit" the highway. While the Court considers the totality of these factors and no single factor is determinative, it will take each allegation in turn.

11. Officer Shafer's belief that the Jeep was driving in tandem with the Buick was based solely on the Jeep briefly pulling to the shoulder of the road when Officer Shafer turned on his emergency lights. This fact alone is insufficient to demonstrate that the vehicles were driving in tandem. Considering the legal requirement that vehicles pull to the shoulder of the roadway when an emergency vehicle with emergency lights on approaches, it would have been a violation of law for the Jeep to *not* pull briefly to the shoulder. *See* TEX. TRANSP. CODE ANN. § 545.156 (Vernon 1999).

12. The government cites many cases where vehicles were traveling in tandem. *See United States v. Reyna,* 79 Fed.Appx. 665, 2003 WL 22477697 (5th Cir.2003) (concluding that the vehicles were traveling in tandem without analysis as to what led to those beliefs); *United States v. Lopez,* 911 F.2d 1006 (5th Cir.1990) (determining vehicles to be traveling in tandem when they were communicating with each other on CB radios); *United States v. Miranda–Perez,* 764 F.2d 285 (5th Cir.1985) (holding that cars were driving in tandem when they were both new, both had California license plates on the rear only, and were observed traveling together for several miles); *United States v. Barnard* 553 F.2d 389, 392 (5th Cir.1977) (finding vehicles to be driving in tandem where they were the first two vehicles on the road in over 30 minutes, both had CB antennas and the first vehicle appeared to be speaking into a microphone, the license plates of both vehicles had the same three letter prefix, and the officer followed the vehicles for ten to fifteen miles). Unlike the present case, all of the above cases cited by the government contained many facts, beyond the mere pulling to the shoulder at the appearance of police lights, that indicated the vehicles were driving in tandem.[3]

13. In light of these cases and Officer Shafer's observation of the two vehicles for a but a brief moment, there was insufficient evidence for Officer Shafer to believe the Buick and Jeep were driving in tandem. Officer Shafer's belief that the Buick and Jeep were traveling in tandem, although ultimately proved correct, was nothing more than a "hunch."

14. Officer Shafer's "hunch" that the vehicles were traveling in tandem was transmitted to Sgt. Pond through the dispatcher. Sgt. Pond was told to "find some reason to pull the jeep over." It was shortly thereafter that Sgt. Pond overheard the transmission from Officer Shafer requesting Border Patrol assistance with the Buick.

15. Sgt. Pond testified that when he spotted the Jeep it was traveling approximately thirty-five miles per hour in a fifty mile per hour zone and had three or four cars traveling behind it. Sgt. Pond testified that he believed the vehicle was impeding traffic in violation of TEX. TRANSP. CODE ANN. § 545.363 (Vernon 1999), which states that "an operator may not drive so slowly as to impede the normal and reasonable movement of traffic, except when reduced speed is necessary for safe operation or in compliance with law." Texas law also provides that "an operator may not drive at a speed greater than is reasonable and prudent under the conditions and having regard for actual and potential hazards then existing." TEX. TRANSP. CODE ANN. § 545.351 (Vernon 1999). Considering these two laws and the fact that the Jeep was traveling through light rain in a construction zone, there is nothing to counter Defendants' argument that the Jeep was driving properly under the conditions. In addition, testimony from Sgt. Pond at trial indicated that the other vehi-

---

**3.** *"Although observation of two cars in proximity on a sparsely traveled road does not itself justify a stop,* it may understandably raise the officer's suspicions." *United States v. Bar-* *nard,* 553 F.2d 389, 392 (5th Cir.1977) (citing *United States v. Larios–Montes,* 500 F.2d 941, 943 (9th Cir.1974)) (emphasis added).

cles would be prevented from passing the Jeep for only one to two miles. Finally, Sgt. Pond did not stop the Jeep until after it had pulled into an abandoned restaurant, nor did he issue a citation for impeding traffic or identify this as his reason for pulling the Jeep over at the time.

16. Sgt. Pond also testified that the slow speed of the Jeep was consistent with the allegations that it was driving in tandem with the Buick. Sgt. Pond stated that often when two vehicles are traveling together and one is stopped, the remaining vehicle slows down so that it can catch up.

17. Sgt. Pond further testified that the driver change at the deserted restaurant was suspicious. The government did not provide, nor did the Court discover, any cases supporting Sgt. Pond's position that a driver change would support reasonable suspicion to stop a vehicle. Further, no cases were found that were consistent with Sgt. Pond's allegations that people engaged in illegal activity often switch drivers shortly after the police begin to follow them.[4]

18. Finally, Sgt. Pond testified that the driver's act of "looking for a part to be exiting off the roadway" was suspicious to him. The driver's behavior is certainly a factor to consider in determining reasonable suspicion. *See United States v. Arvizu,* 534 U.S. 266, 272–74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). However, considering the totality of the circumstances, this factor does not convince the Court that there was a reasonable suspicion to stop the Jeep.[5]

19. Many factors that may, individually, have an innocent explanation, taken together, can be used as the basis for reasonable suspicion. The Court finds, however, that the combination of factors in this case are not sufficient to establish reasonable suspicion as to stop of the Jeep. *See Illinois v. Wardlow,* 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). A court may not arrive at reasonable suspicion "simply by piling hunch upon hunch." *Valenzuela,* 365 F.3d at 897. Considering the totality of the circumstances in the case at hand, Officer Shafer's belief that the Jeep and Buick were traveling together was not enough to form reasonable suspicion. It did not become enough when it was transferred to Sgt. Pond over the radio. This transmission, taken together with the other factors alleged by the government, are wholly consistent with innocent travel and are not enough to form the basis for reasonable suspicion. As such, all evidence from and as a result of the stop of the Jeep is suppressed.

## Conclusion

The Fourth Amendment's core function is to safeguard the privacy and security of individuals from intrusive and arbitrary invasions by governmental officials. *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The Fourth Amendment extends to protect the innocent and guilty alike. The government must prove that an investigatory

---

4. A change in drivers is a completely innocent and common driving occurrence, such as may occur when drivers on a long trip become fatigued.

5. In addition, Sgt. Pond testified that he could not see anyone in the Jeep except for "Ms. Ross and Mr. Ross." A vehicle containing only two passengers is not consistent with illegal alien smuggling.

stop is supported by reasonable suspicion. As to defendant Bernardino, the stop of the Buick was supported by probable cause based on the traffic violation of an apparent defective muffler. His continued detention was based on reasonable suspicion from the undocumented individuals in his car. Nor were Bernardino's *Miranda* rights violated, as he was never restrained to an extent that would lead a reasonable person to believe they were under arrest. The stop of the Jeep, however, was not based on reasonable suspicion. Accordingly, Defendant Bernardino Meraz–Meija's Motion to Suppress is DENIED (docket no. 72) and the Motions to Suppress of Defendants Karina Ross, Ben Hur Meraz–Meija, and James Francis Joseph Ross are GRANTED (docket nos. 12, 23, 51, 55 and 56).