**UNITED STATES OF AMERICA, Plaintiff**
**v.**
**KEVIN HARVEY, Defendant**

Criminal No. 2005-96

District Court of the Virgin Islands

Division of St. Thomas and St. John

November 29, 2006

DELIA L. SMITH, AUSA, St. Thomas, U.S.V.I., *For the Plaintiff.*

MICHAEL E. FITZSIMMONS, ESQ., St. Thomas, U.S.V.I., *For the Defendant.*

GOMEZ, *Chief Judge*

## MEMORANDUM OPINION

(November 29, 2006)

Before the Court is the motion of Kevin Harvey ("Harvey") to suppress all evidence seized as a result of his arrest on November 3, 2005. A suppression hearing was held on this matter on May 24, 2006. Following oral argument, the Court requested additional briefing from both parties on issues raised at the hearing but not discussed in the original briefs. For the reasons set forth below, the Court will grant the motion to suppress.

## I. FACTS

On September 30, 2005, a seizure warrant was issued by Magistrate Judge Geoffrey Barnard for a vehicle, which the government alleged was involved in the drug trafficking activities of Alexci Emmanuel ("Emmanuel"), a defendant in another case. The vehicle was described in the seizure warrant as a silver 2000 Acura Integra, bearing Virgin Islands license plate number TBY - 454 (hereinafter the "Acura"). The Acura is registered to Emmanuel's girlfriend, Saida Wade.

The basis for the seizure warrant was an affidavit provided by Drug Enforcement Agent Michael Goldfinger. Agent Goldfinger was conducting a drug conspiracy investigation in which Emmanuel was allegedly

involved. Paragraph 2 of the affidavit states: "This affidavit is offered in support of an application for seizure of the following property. ..." Goldfinger Aff. ¶ 2. It then lists six items to be seized, including two motor vehicles: a Toyota Tundra, and the Acura. Both vehicles were identified with the same degree of specificity, including vehicle identification number, tag number, make, model, and color.[1]

The affidavit continues for 28 paragraphs, occupying nine single-spaced pages. Paragraphs 3 through 15 describe various controlled transactions between a government informant and various defendants in another case. Paragraphs 16 through 27 detail various cell phone conversations of the defendants in another case, which were intercepted by the police. Paragraph 28 concludes that the information set forth in the preceding paragraphs created probable cause to seize the items listed in Paragraph 2 "as facilitating property or proceeds obtained as a result of drug trafficking activity. ..."

The Acura is not mentioned in the body of the affidavit. In fact, the affidavit contains only two references to motor vehicles. First, Paragraph 26 describes a "white 1998 Mazda Millenia." Notably, this Mazda was not one of the assets to be seized pursuant to this affidavit. The only other mention of a motor vehicle in the body of the affidavit is at the end of Paragraph 27, where the affidavit refers to a "car." In describing a cell phone conversation intercepted by the police, Paragraph 27, in pertinent part, states:

> Defendant Fagan told Defendant MARK, "Yeah, I [am] going to be on the move now. Man just brought by the car". ... Previous surveillance and intercepted telephone calls revealed that this conversation is referring [to] Defendant FAGAN telling Defendant MARK that he has the car from Defendant EMMANUEL and is ready to pick up the cocaine that is supposed to be dropped off. ...

Goldfinger Aff. ¶ 27.

On November 3, 2005, Harvey was observed driving a vehicle near Home Town Convenience Store in St. Thomas. The vehicle matched the

---

[1] The warrant at the center of this suppression motion actually listed an incorrect vehicle identification number for the Acura. On November 17, 2005—two weeks after the Acura was seized—Attorney Patricia Sulzbach and Agent Goldfinger obtained a second warrant from Judge Barnard, which contained the correct vehicle identification number.

description of the Acura at the center of the search warrant. Lieutenant Rodney Querrard, an[d] High Intensity Drug Trafficking Area ("HIDTA") task force officer, ordered the defendant to drive into the Hometown parking lot. Lieutenant Querrard then waited for Drug Enforcement Administration ("DEA") Agents Goldfinger and Darnell Blake to arrive before exiting his vehicle to approach the defendant. Upon their arrival, Harvey was asked to produce the vehicle registration, proof of insurance, and his driver's license. Harvey produced the first two documents, but stated that he did not possess a driver's license, though he was in the process of obtaining one.

The DEA agents thereafter informed Harvey that they were seizing the Acura pursuant to the seizure warrant, at which point Lieutenant Querrard asked Harvey a routine question:

> I asked him, I said, "Do you have anything in particular that belongs to you," which is a normal practice, because our intent — my intention and I'm pretty sure all of our intentions, was to actually turn him loose. He was not part of the investigation. He was just, he just happened to be driving the vehicle. ...

Trans, of Suppression Hr'g at 8-10. Harvey's response to this question is unclear. According to Lieutenant Querrard:

> [Harvey] hesitated, and he said he don't really think so. He might have, I think it was a document or something. He said that he might have something in there. So I asked him, I said, "Where is it? Because I'll get it for you." And I don't know exactly what he said from there, but he continued talking with the two [DEA] agents. And I proceeded to the vehicle.

*Id.* at 8-10. Lieutenant Querrard then searched the Acura and discovered a shopping bag containing four ounces of marijuana.

The agents then arrested Harvey. After Harvey was arrested, Lieutenant Querrard questioned him. The content of the questioning was revealed at the suppression hearing, when the defense counsel engaged in the following inquiry with Lieutenant Querrard:

Q: ... And did you ask him, then, if it was his marijuana?
A. He did, he did say it was his marijuana.
Q. Did you ask him if it was his marijuana?

A. I don't recall exactly what I asked him. But it is a possibility, yes.

Q. So that question was before he was advised of his rights; is that correct?

A. I would say that.

*Id.* at 21-22. Harvey was then taken to the DEA field office, where he was advised of his rights.

While at the DEA field office, Harvey waived his right to counsel and agreed to be questioned. During the subsequent questioning, Harvey provided the agents with the address of his residence and signed a consent to search form authorizing a search of the residence.

The search revealed a knapsack containing a fully loaded semi-automatic weapon with an extended magazine containing hollow point bullets, $1,500 in cash, approximately 40.5 grams of crack cocaine, and other drug paraphernalia.

Harvey contends that the seizure warrant was unsupported by facts amounting to probable cause. Harvey also claims that the stop, seizure and search of the Acura and his subsequent arrest were in violation of the Fourth Amendment. Harvey seeks to suppress all evidence found as a result. Harvey moves to exclude the marijuana found in the Acura; all statements he made to the law enforcement officers on November 3, 2005; and all items found in the apartment, including the cocaine, the semi-automatic weapon, the hand scale, the electronic scale, the packaging material, and the cooler packaged within a cardboard box.

## II. DISCUSSION

The Fourth Amendment protects citizens from "unreasonable searches and seizures" of "their persons, houses, papers and effects." U.S. CONST. amend. IV.[2] The first clause protects citizens from governmental intrusions where they have a reasonable expectation of privacy. There is a presumptive requirement that searches or seizures be carried out pursuant to a warrant. *See Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) ("searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se

---

[2] "The Fourth Amendment is made applicable to the Virgin Islands by the Revised Organic Act of 1954, § 3." *United States v. Charles*, 290 F. Supp. 2d 610, 614 (D.V.I. 1999).

unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.") (internal citations omitted). Warrant-less searches or seizures must generally be based on probable cause in order to be considered reasonable. *See Hill v. California*, 401 U.S. 797, 804, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971) ("sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment. ...")

 The Supreme Court has explained the distinction between searches and seizures:

> A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.

*United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). Moreover, the Supreme Court has clearly stated that "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Soldal v. Cook County*, 506 U.S. 56, 68, 113 S. Ct. 538, 121 L. Ed. 2d 450 (1992).

## III. ANALYSIS

### A. Standing

 As a threshold matter, Harvey's claim may proceed if he has standing to challenge the government action. Standing to contest government action under the Fourth Amendment "requires that the individual challenging a search have a reasonable expectation of privacy in the property searched, and that he manifest a subjective expectation of privacy in the property searched." *United States v. Baker*, 221 F.3d 438, 442 (3d Cir. 2000) (citing *California v. Greenwood*, 486 U.S. 35, 39, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988); *Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1977)).

> Whether the driver of a car has the reasonable expectation of privacy necessary to show Fourth Amendment standing is a fact-bound question dependent on the strength of his interest in the car and the nature of his control over it; ownership is not necessary.

*Baker*, 221 F.3d at 442 (finding that the defendant had standing to object to the search of a car that was registered in someone else's name).

■ Harvey claims to have borrowed the car. In support of this claim, Harvey argues that he produced vehicle registration and insurance bearing the owner's name. Additionally, the government has put forth no evidence that Harvey stole or was in wrongful possession of the Acura. Under these circumstances, Harvey has met his burden of demonstrating Fourth Amendment standing. *Cf. Baker*, 221 F.3d at 442 (holding that a defendant had standing to object to the search of a car he claimed to have borrowed when he clearly possessed and controlled the car and there was no evidence that he obtained the car illegally or knowingly possessed a stolen car).

Harvey thus has standing to challenge the seizure of the Acura.

## B. Basis for the Seizure Warrant

A magistrate's decision to issue a warrant is entitled to great deference. *Illinois v. Gates*, 462 U.S. 213, 236, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). De novo review of a magistrate's probable cause determination is inconsistent with the warrant requirement of the constitution. *See Ornelas v. United States*, 517 U.S. 690, 698-699, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996) (reasoning that de novo review of a magistrate's decision would eliminate the incentive for police to use the warrant process); *see also United States v. Ritter*, 416 F.3d 256, 262 (3d Cir. 2005); *United States v. Whitner*, 219 F.3d 289, 299 (3d Cir. 2000). However, "[i]n order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued." *Gates*, 462 U.S. at 239; *see also United States v. Leon*, 468 U.S. 897, 915, 104 S. Ct. 3405, 82 L. Ed. 2d 677, 1984 U.S. LEXIS 153, 52 U.S.L.W. 5155 (1984) (holding that a magistrate's decision "cannot be a mere ratification of the bare conclusions of others"); *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002) (stating that reviewing courts should not simply rubber stamp a magistrate's conclusions regarding probable cause).

■ Accordingly, the standard of review for the sufficiency of an affidavit is whether the affidavit provided a "substantial basis" for the magistrate's decision that probable cause existed to issue the warrant. *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993); *see also Gates*, 462 U.S. at 238 (holding that a magistrate must have a substantial

basis for concluding that probable cause existed). The test for whether probable cause exists in the first instance depends on the totality of the circumstances:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238. If an affidavit does not contain sufficient information to allow the magistrate to determine by a fair probability that evidence will be found, then the warrant should be deemed invalid. *See Leon*, 468 U.S. at 915 (noting that courts will not defer to a warrant when the supporting affidavit contained insufficient information to enable the magistrate to determine probable cause).

■ Whether a substantial basis existed for the magistrate's probable cause determination necessarily depends on what evidentiary factors are relevant to the magistrate's finding of probable cause. Such factors include: the cumulative weight of the information set forth in the affidavit by the investigating officer, the reasonable inferences made by the officer based on his specialized training and experience, and the "veracity" and "basis of knowledge" of persons supplying hearsay information. *See United States v. Yusuf*, 461 F.3d 374, 390 (3d Cir. 2006) (awaiting publication) (discussing the cumulative weight of the information in connection with the officer's reasonable inferences); *Gates*, 462 U.S. at 268 (discussing the veracity and basis of knowledge of informants' tips). In determining whether 'the above factors provide sufficient information for the magistrate to decide probable cause, reviewing courts should read the affidavit holistically in a non-technical manner. *Conley*, 4 F.3d at 1206, 1208. Additionally, the inquiry is constrained to the information contained within the four corners of the affidavit offered in support of the warrant application. *Id.* at 1205.

For example, in *United States v. Zimmerman*, the Third Circuit invalidated a warrant to search the defendant's home for child and adult pornography because it found that the affidavit did not provide a substantial basis for the magistrate's decision to issue the warrant. *Zimmerman*, 277 F.3d at 435-436. Because the affidavit contained no indication that the defendant had ever purchased or possessed child

pornography, the *Zimmerman* court quickly concluded that it could not provide a substantial basis for the magistrate's decision. *Id.* at 432. Furthermore, the court found that the affidavit's one reference to the defendant's alleged possession of adult pornography six to ten months prior to the issuance of the warrant did not provide a substantial basis for a finding of probable cause to seize adult pornography from his home. *Id.* at 435-436.

Here, the affidavit purported to show probable cause to seize the Acura pursuant to title 21, section 853 of the United States Code. According to this statute, any person convicted of violating federal drug laws must forfeit the following property:

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;

(2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation. ...

21 U.S.C. § 853(a)(2006). Section 853(f), which governs seizure warrants for property subject to forfeiture under section 853(a), states that the government may request these warrants "in the same manner as provided for a search warrant." Furthermore, a seizure warrant shall issue if the court determines that "there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture," and that a protective order will not suffice to assure the availability of the property. 21 U.S.C. § 853(f).

 Agent Goldfinger's affidavit includes the Acura in the general list of items to be seized. However, the body of the affidavit makes no reference to the Acura. Indeed, Paragraph 27 briefly refers to "a car" participating in a drug transaction, but does not indicate which vehicle listed in Paragraph 2, if any, was involved. Read in its entirety, the affidavit concludes that the Acura is property subject to forfeiture, but contains no reason for this conclusion. Despite its nine-page length, the affidavit was clearly bereft of evidence—either direct or inferred through police conclusions—that could justify a finding of probable cause at the time the warrant was issued. *See Zimmerman*, 277 F.3d at 435-436. Therefore, the affidavit fails to provide a substantial basis for a magistrate to decide by a fair probability that the Acura was subject to forfeiture because it was used to facilitate drug trafficking, or had been

647

obtained from, drug money. *See* 21 U.S.C. § 853(a)(1)-(2). Accordingly, the seizure warrant issued pursuant to this affidavit was invalid.

### C. Good Faith Exception to the Warrant Requirement

██ Even though the warrant is invalid, the government argues that the evidence should not be suppressed because the good faith exception to the exclusionary rule applies. *See United States v. Leon*, 468 U.S. 897, 922, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). Under the good faith exception, suppression of evidence "'is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority,' even though no probable cause exists." *Zimmerman*, 277 F.3d at 436 (quoting *United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001)).

██ The purpose of the exclusionary rule is central to the determination of whether the good faith exception will apply. *See Zimmerman*, 277 F.3d at 436. The purpose of the exclusionary rule is to deter police from engaging in conduct that violates citizens' constitutional rights. *Id.* This deterrent purpose assumes that the police have engaged in willful or negligent conduct resulting in the deprivation of constitutional rights. *See United States v. Peltier*, 422 U.S. 531, 539, 95 S. Ct. 2313, 45 L. Ed. 2d 374 (1975) (quoting *Michigan v. Tucker*, 417 U.S. 433, 447, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974)). By excluding illegally-obtained evidence, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused." *Id.* Thus, the deterrent purpose of the exclusionary rule mandates that the test for whether the good faith exception applies is objective: "the fruits of an unconstitutional search [or seizure] should be suppressed if, despite the magistrate's authorization, an objectively reasonable, well-trained officer would have known that the search violated the Fourth Amendment." *Zimmerman*, 277 F.3d at 436 (citing *Leon*, 468 U.S. at 919).

██ Generally, a warrant issued by a magistrate is sufficient to establish that a police officer has acted in good faith in conducting a search or seizure. *Id.* Courts have identified four situations, however, where "an officer's reliance on a warrant would not be reasonable, and would not trigger the good faith exception." *Id.* (quoting *United States v. Hodge*, 246 F.3d 301, 308 (3d Cir. 2001)). These four situations include:

1. Where the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit;

2. Where the magistrate abandoned his or her judicial role and failed to perform his or her neutral and detached function;

3. Where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or,

4. Where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Id.* at 436-437. If only one of the above conditions is present, the good faith exception will not apply. *Id.* at 437.

In *Zimmerman,* the Third Circuit addressed the third situation in which the good faith exception does not apply. *Id.* In that case the warrant authorized the seizure of both adult and child pornography, but only one (outdated) piece of information indicated that adult pornography might be present in the defendant's home, and there was no indication that the defendant had ever possessed child pornography. *Id.* The Third Circuit noted that it was not until the last line of the fifth page of the affidavit that the affiant even mentioned pornography, "much less anything that might provide probable cause to search for pornography in [the defendant's] home, and that mention ... was fleeting." *Id.* Thus, after holding that no substantial basis existed for the magistrate's determination of probable cause to seize adult or child pornography, the court concluded that "any 'reasonably well-trained officer' would have known that there was marginal evidence at best of adult pornography, evidence which was anything but current, and no evidence whatsoever to support a search for child pornography." *Id.* Accordingly, the good faith exception did not apply, and the fruits of the illegal search and seizure were suppressed. *Id.* at 438.

The *Zimmerman* Court noted that "[g]ood faith is not a magic lamp for police officers to rub whenever they find themselves in trouble." *Id.* (quoting *United States v. Reilly,* 76 F.3d 1271, 1280 (2d Cir. 1996)). This is particularly true where the affiant is also one of the executing officers.

In *Zimmerman,* the officer who applied for the warrant was also the author of the supporting affidavit and was one of the executing officers. *Id.* The court reasoned that

it is somewhat disingenuous, after having gone to the magistrate with the paltry showing seen here, to suggest ... that at bottom it was the magistrate who made the error and the search and seizure are insulated because the officer's reliance on that error was objectively reasonable.

*Id.* This disingenuousness aside, the *Zimmerman* Court noted that, "[t]he good faith exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all known facts." *Id.* (quoting *Reilly*, 76 F.3d at 1273). Moreover, "[t]he objective standard 'requires officers to have a reasonable knowledge of what the law prohibits.'" *Id.* (quoting *Leon*, 468 U.S. at 919-20 n.20).

 Except for its initial mention in the list of items to be seized, the affidavit in this case makes no mention of the Acura or its involvement in the drug conspiracy under investigation. Here, as in *Zimmerman*, the one purported reference to the item to be seized occurs at the end of a lengthy affidavit. The reference to a "car" in Paragraph 27 is more vague and fleeting than the reference to adult pornography in the *Zimmerman* affidavit that the court held to be "marginal evidence at best." *Id.* at 437. Additionally, like the pornography reference in *Zimmerman*, the nebulous reference to "a car" in this case was outdated, as it was based on events that allegedly took place five months prior to the seizure.

Agent Goldfinger was the affiant and one of the executing officers in this case. Especially given his extensive involvement in the Title III investigation, Agent Goldfinger should have known that the marginal evidence contained in the affidavit could not support probable cause to seize the Acura.[3] Thus, it would be "somewhat disingenuous" for the government to claim that the DEA agents were acting in good faith reliance on the magistrate's decision to issue the warrant.

In sum, the affidavit in this case was so lacking in indicia of probable cause as to render official belief in the existence of probable cause

---

[3] The fact that it was Lieutenant Querrard (not Agent Goldfinger) who initially pulled the Acura over because it was the subject of the seizure warrant does not change the analysis. This is because "investigating officers 'cannot rely on colleagues who are ignorant of the circumstances under which the warrant was obtained' to insulate the search from constitutional scrutiny." *Zimmerman*, 277 F.3d at 438 n.8 (quoting *Leon*, 468 U.S. at 923 n.24).

entirely unreasonable.[4] Therefore, the good faith exception to the warrant requirement does not apply.

## D. The Search of the Acura

 Even though the seizure warrant was invalid, the agents may nonetheless have been justified searching the Acura. The police do not need a warrant to search an automobile if they have independent probable cause to believe that the vehicle contained contraband or evidence of a crime. *See United States v. Ross*, 456 U.S. 798, 804-09, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982) (citing *Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543, T.D. 3686 (1925)); *see also Chambers v. Maroney*, 399 U.S. 42, 46-47, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970) (affirming the constitutionality of a search because the police had probable cause to believe car contained evidence of robbery because car matched eyewitnesses' descriptions). Here, the government admitted that the agents had no independent probable cause to believe the vehicle driven by Harvey contained contraband before they seized it. Thus, the search of the Acura cannot be justified on this basis.

 The search of the Acura could have been justified if the police developed probable cause to search the vehicle while conducting a lawful investigatory stop. In order to be lawful, a brief investigatory detention must be based on reasonable suspicion (though it need not be based on probable cause). *Ornelas*, 517 U.S. at 693 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). Under this standard, the police must demonstrate "a particularized and objective basis" for suspecting that the person stopped committed a crime or that the property detained constituted evidence of criminal activity. *See Ornelas*, 517 U.S. at 696 (quoting *United States v. Cortez*, 449 U.S. 411, 417-418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 106-112, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (extending the reasonable suspicion analysis to the context of automobile stops). The reasonable suspicion analysis is fact-intensive, and focuses only on the events leading up to the stop. *Ornelas*, 517 U.S. at 696. Additionally,

---

[4] In this case, there are no allegations of deliberate misrepresentations contained in the affidavit; there is no evidence that the magistrate judge had abandoned his detached and neutral role; and, the warrant was not facially deficient for failure to adequately particularize the item to be seized.

officers may use their own training and experience as well as the observations of other officers in concluding whether or not reasonable suspicion exists to make a stop. *United States v. Arvizu*, 534 U.S. 266, 277, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002).

The government has failed to demonstrate that the agents had a particularized, objective basis for suspecting that the Acura was involved in drug trafficking, or any illegal conduct that would give rise to reasonable suspicion to stop the car. Lieutenant Querrard admits that he never personally saw the vehicle used in any drug trafficking activity. Rather, he allegedly relied upon the conclusions of other officers that probable cause existed to seize the Acura. Moreover, the government has not demonstrated that any officer involved in the investigation had reasonable suspicion to stop the vehicle. In fact, none of the agents offered any facts supporting the Acura's involvement with drug trafficking, except for the single wiretap reference to a "car" found in Paragraph 27 of the affidavit. This fleeting and incredibly general reference could hardly be considered to provide a particularized, objective basis to believe that a silver, 2000 Acura Integra, bearing Virgin Islands license plate number TBY - 454 was involved in the drug trafficking conspiracy. *See United States v. Brown*, 448 F.3d 239, 246-247, 252 (3d Cir. 2006) (holding that "an excessively general description ... does not constitute reasonable suspicion under the 'narrowly drawn authority' of *Terry v. Ohio*."). Thus, no reasonable suspicion existed to stop the Acura based on its alleged connection with the drug trafficking conspiracy.

Additionally, the government has not offered any evidence to suggest that the officers had an independent reasonable basis upon which to stop the Acura beyond its purported involvement in drug trafficking activities. Indeed, Lieutenant Querrard admitted that his intention from the beginning (and likely the intention of all of the agents) was to seize the Acura and release Harvey.[5] The government also has not asserted that Harvey committed any traffic violation that could have given rise to the stop.[6] *Cf. Whren v. United States*, 517 U.S. 806, 811-13, 116 S. Ct. 1769,

---

[5] If the agents had reasonably suspected Harvey of independent criminal activity, they would not likely have planned to release him.

[6] Lieutenant Querrard did, however, learn that Harvey had been driving without a license, and issued him a traffic citation (that was never actually filed), presumably for

135 L. Ed. 2d 89 (1996) (holding that the search of a vehicle was valid because reasonable suspicion objectively existed that the defendant had committed a traffic violation).

■■ Based on the foregoing, the Court finds that no objectively reasonable basis existed before the stop was made to believe that the Acura contained evidence of criminal activity, that Harvey was engaged in criminal activity, or even that the agents had reason to stop the Acura for a traffic violation. Even examined independently of the invalid seizure warrant, the stop was unlawful. Accordingly, the government cannot claim that information gained during the unlawful stop provided the agents with valid probable cause to search the Acura. Therefore, the search was conducted in violation of Harvey's Fourth Amendment rights, and the marijuana found during this illegal search will be suppressed. *Mapp v. Ohio*, 367 U.S. 643, 649, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, 86 Ohio Law Abs. 513 (1961) (holding that suppression of evidence obtained in violation of the Fourth Amendment is constitutionally required).

### E. The Interrogation of Harvey

■■ After arresting Harvey for possession of the marijuana found during the illegal search described above, the DEA agents questioned Harvey before they advised him of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (holding that absent procedural safeguards, there is an irrebuttable presumption of coercion when a defendant is interrogated while in police custody). *Miranda* explained that the Fifth Amendment privilege against compelled self-incrimination protects a defendant from coercive interrogation while in the custody of the police. *Id.* at 444-445. Thus, two elements must be present for *Miranda* to apply. First, the defendant must have been in police custody at the time the statements were made. *See, e.g., Yarborough v. Alvarado*, 541 U.S. 652, 662-663, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004) (holding that custody for *Miranda* purposes is determined by examining the totality of the circumstances surrounding interrogation and determining whether a reasonable person would have felt free to terminate interrogation and leave). Second, the police must

---

this reason. These events occurred after the stop, however, so they are not part of the reasonable suspicion analysis. *See Ornelas*, 517 U.S. at 696-697.

have interrogated the defendant, which includes not only direct questioning, but any words or actions that the police should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301-302, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

 When a defendant is subject to custodial interrogation by the police, procedural safeguards are necessary to preserve the defendant's Fifth Amendment privilege against compelled self-incrimination. *Miranda*, 384 U.S. at 479. Accordingly, the police may not interrogate a defendant unless they have first warned him that (i) he has the right to remain silent; (ii) anything he says can be used against him in court; (iii) he has the right to the presence of an attorney; and, (iv) if he cannot afford an attorney, one will be appointed for him if he so desires. *Id.* If the police interrogate a defendant in custody without first giving the above warnings, any statements they obtain as a result may be inadmissible at trial. *Id.*

 The agents questioned Harvey after they had arrested him at the site of the stop, but before he was advised of his *Miranda* rights in the DEA field office. Harvey was clearly in police custody at the time of the questioning. *See Orozco v. Texas*, 394 U.S. 324, 329, 89 S. Ct. 1095, 22 L. Ed. 2d 311 (1969) (explaining that "[o]nce arrest occurs, the application of Miranda is automatic") Additionally, direct questioning about the marijuana constitutes interrogation. *See Edwards v. Arizona*, 451 U.S. 477, 487, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) (finding that confronting the defendant with incriminating evidence is interrogation). Thus, even if the search had not violated Harvey's Fourth Amendment rights, his statements as to his ownership of the marijuana found in the Acura would not be admissible as evidence of guilt in the government's case-in-chief because the government violated Harvey's rights under *Miranda. Miranda*, 384 U.S. at 444; *but see New York v. Quarles*, 467 U.S. 649, 655-656, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984) (holding that testimonial evidence obtained as a direct result of a *Miranda* violation is nonetheless admissible when a threat to public safety necessitated immediate questioning).

## F. The Search of Harvey's Residence

The DEA agents did not search Harvey's residence until after he had been advised of his rights, waived his right to counsel, agreed to be questioned, and signed a form consenting to the search of his home.

Harvey claims that despite this waiver and consent, any statements he made to law enforcement officers on November 3, 2005, and all evidence found during the subsequent search of his home should be suppressed as the fruit of the prior illegal stop and search of the Acura. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (extending the exclusionary rule to the indirect products, or fruit, of a Fourth Amendment violation).

█ When a defendant has waived his *Miranda* rights and consented to a search after a Fourth Amendment violation, the admissibility of evidence discovered thereafter turns on: (1) whether such waiver and consent was validly obtained; (2) whether the defendant has standing to object to the primary illegality; and (3) whether the waiver and consent were independent acts of free will sufficient to break the causal chain between the primary illegality and the proffered evidence.[7] *See id.* at 487-488, 492 (holding that the fruits of an illegal search or seizure are inadmissible if the defendant has standing to object to the primary illegality and the proffered evidence was not obtained through exploitation of the primary illegality); *Brown v. Illinois*, 422 U.S. 590, 601-604, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (holding that *Miranda* warnings are necessary, but may not be sufficient, to purge the taint of the prior Fourth Amendment violation); *United States v. Jones*, 234 F.3d 234, 242 (5th Cir. 2000) ("the admissibility of the evidence challenged as inadmissible under the Fourth Amendment turns on a two-pronged inquiry: 1) whether the consent was voluntarily given; and 2) whether the consent was an independent act of free will.").

---

[7] This inquiry focuses on the effect of the prior illegal stop, search, and arrest of Harvey, not the prior violation of his *Miranda* rights. A *Miranda-defective* statement that was otherwise voluntary under the Fifth Amendment will not render the evidence derived therefrom inadmissible. *See United States v. Patane*, 542 U.S. 630, 637-638, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004) (allowing a gun into evidence that was discovered as a result of un-warned yet voluntary statements made by a defendant whose Fourth Amendment rights had not been violated); *Oregon v. Elstad*, 470 U.S. 298, 311-314, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (declining to exclude a second warned confession as the fruit of a prior un-warned yet voluntary confession, where no Fourth Amendment violation was involved). However, where a Fourth Amendment violation is involved, the fruit of the poisonous tree doctrine applies. *See Elstad*, 470 U.S. at 306 (reasoning that "a procedural *Miranda* violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the 'fruits' doctrine.").

As a threshold matter, a waiver of a defendant's *Miranda* rights and a defendant's consent to a search must be validly obtained in order for the evidence obtained thereafter to be admissible. A defendant who has been advised of, but has not yet invoked, his *Miranda* rights may waive them—provided he does so knowingly, intelligently, and voluntarily, given the totality of the circumstances. *See Moran v. Burbine*, 475 U.S. 412, 422-423, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986) (validating the defendant's waiver of his *Miranda* rights because such waiver was uncoerced, the defendant knew he could remain silent and request lawyer, and he was aware of the government's intention to use his statements against him). Consent to a search is valid if it is voluntary—if under the totality of the circumstances it is free from explicit or implicit police coercion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 228-229, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) (distinguishing consent to search from waiver of a trial right because the defendant's "knowledge of a right to refuse to consent to a search is not a prerequisite of a 'voluntary' consent.") There is no indication of any defect in Harvey's waiver of his *Miranda* rights or in his consent to the search of his apartment.

With respect to the second prong, the Court has already determined that Harvey has standing to object to the primary Fourth Amendment violation—the stop and search of the Acura. Therefore, the admissibility of the Harvey's warned statements and the evidence found at his house turns on the third prong: whether the agents exploited the illegal stop and search to obtain Harvey's incriminating statements and the evidence found during the search of Harvey's residence.

After a Fourth Amendment violation, neither the fact that a defendant was given *Miranda* warnings nor the fact that he consented to a subsequent search is per se sufficient to remove the taint of the primary illegality. *See Brown*, 422 U.S. at 601-604 (1975) (holding that *Miranda* warnings alone cannot always break the causal chain); *Jones*, 234 F.3d at 242 (holding that consent to a search does not necessarily dissipate the taint of a prior Fourth Amendment violation). Indeed, even if a defendant has validly waived his *Miranda* rights and voluntarily consented to a search, the government still bears the burden of proving that such waiver or consent was an independent act of free will that broke the causal connection between the primary illegality and the proffered evidence. *See Brown*, 422 U.S. at 603; *Jones*, 234 F.3d at 243.

 Factors indicating the defendant's waiver of his *Miranda* rights or consent to a subsequent search were independent acts of free will that break the causal chain of the Fourth Amendment violation include: (1) the temporal proximity of the illegal conduct and the waiver or consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. *Brown*, 422 U.S. at 603-604; *Jones*, 234 F.3d at 243. For example, in *Brown* the defendant had been illegally arrested, but thereafter waived his *Miranda* rights and made incriminating statements. *Brown*, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416. Despite the valid waiver of the defendant's *Miranda* rights, the Supreme Court suppressed the defendant's statements as the fruit of the illegal arrest. The Court held that the waiver was not a sufficiently independent act of free will to break the causal chain because the first statement was separated from the illegal arrest by less than two hours, there was no significant intervening event, and the arrest was investigatory in design and purpose. *Id.* at 604-605. Thus, the police had exploited the prior illegality to obtain the statement. *Id.*

Similarly, the Fifth Circuit has held that the taint of a border patrol agent's illegal stop of defendant's vehicle had not dissipated at the time the defendant consented to agent's search of vehicle. *United States v. Chavez-Villarreal*, 3 F.3d 124, 128 (5th Cir. 1993). Accordingly, the evidence found as a result of the search was suppressed, despite the fact that the defendant consented to the search. *Id.* The court reasoned that the consent was not an act of free will sufficient to break the causal chain because the agent held the defendant's alien registration card while he asked for permission to search, and only 15 minutes elapsed between initial stop and search. *Id. But see Wong Sun*, 371 U.S. at 491 (finding that a confession was not the fruit of an illegal search when it was made several days after the primary illegality and was preceded by a lawful arraignment and a release from custody on the defendant's own recognizance).

Lieutenant Querrard testified that he pulled Harvey over at approximately 11:00 a.m. on November 3, 2005. Lieutenant Querrard also attested to Harvey's signature on the form in which Harvey waived his *Miranda* rights. At the suppression hearing, the defense counsel asked Lieutenant Querrard, "[w]hen did he sign that document?"

A. Same date, 11/3/05.

Q. Is there a time indicating when, the time of day that it was signed by him?

A. Approximately 11:30 a.m.

Q. Okay.

A. And it was witnessed by myself and Mr. Goldfinger.

Trans, of Suppression Hr'g at 15-16. During the questioning that occurred immediately thereafter, Harvey informed the agents of the address where he lived and consented to the search of the premises. Thus, the waiver and consent occurred in close temporal proximity to the illegality. Furthermore, Harvey was constantly in police custody from the time of the stop until the waiver and consent. The only change of circumstance during this period was that the agents took Harvey to the DEA field office for questioning. There were no intervening circumstances to break the causal chain between the illegal stop and the statements and evidence obtained thereafter. All this occurred after the DEA agents stopped the Acura for the improper purpose of executing a seizure warrant based on an affidavit that no reasonable officer would have believed could support probable cause for the seizure.

■ Harvey's waiver and confession were not acts of free will sufficient to break the causal chain between the primary illegality and the proffered evidence. Instead, Harvey's incriminating statements and the evidence found at Harvey's residence were obtained through exploitation of the illegal stop and search of the Acura. As a result, Harvey's statements made on November 3, 2005, as well as the cocaine, semi-automatic weapon, hand scale, electronic scale, packaging material, and cooler found at Harvey's home will be suppressed.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant Harvey's motion to suppress. An appropriate order follows.